Submitted January 15, 2019; convictions on Counts 4 and 6 reversed and remanded, remanded for resentencing, otherwise affirmed June 30, 2021

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## RACINA JEAN ALLEN,
*Defendant-Appellant.*

### Klamath County Circuit Court
### 1402843CR; A164597

494 P3d 939

Defendant appeals a judgment convicting her, by unanimous jury verdict, of second-degree assault and unlawful use of a weapon (UUW) (Counts 3 and 5); and, by nonunanimous verdict, of first-degree assault and UUW (Counts 4 and 6). Defendant argues that the trial court erred in admitting the eyewitness identifications of defendant by two state witnesses, in failing to give defendant's proposed jury instruction on assessing eyewitness identification evidence, and that it plainly erred in instructing the jury that it could return nonunanimous verdicts and when it entered convictions based on that instruction. *Held*: First, although the trial court erred in ruling that the test under *State v. Lawson/ James*, 352 Or 724, 291 P3d 673 (2012), for determining the admissibility of eyewitness-identification evidence did not apply, the trial court did not err in alternatively ruling that the evidentiary admissibility requirements were established and allowing the testimony. Second, although the trial court erred in failing to give defendant's proposed eyewitness-identification jury instruction, that error was harmless on this record. Third, the Court of Appeals agreed with and accepted the state's concession that the trial court plainly erred in instructing the jury that it could return a 10-2 verdict on the convictions that were based on nonunanimous verdicts, but concluded that that error did not require reversal on the convictions that were based on unanimous verdicts.

Convictions on Counts 4 and 6 reversed and remanded; remanded for resentencing; otherwise affirmed.

Roxanne B. Osborne, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Mary M. Reese, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Timothy A. Sylwester, Assistant Attorney General, filed the briefs for respondent.

Before DeHoog, Presiding Judge, and Ortega, Judge, and Aoyagi, Judge.

ORTEGA, J.

Convictions on Counts 4 and 6 reversed and remanded; remanded for resentencing; otherwise affirmed.

## ORTEGA, J.

While standing on a porch with friends, Barney and Pelletier got into a confrontation with a woman later identified as defendant; each was stabbed shortly thereafter by someone they identified as the same woman. A jury unanimously found defendant guilty of second-degree assault and unlawful use of a weapon (UUW) for the stabbing of Barney (Counts 3 and 5) and rendered nonunanimous guilty verdicts against defendant for first-degree assault and UUW for the stabbing of Pelletier (Counts 4 and 6). Defendant appeals that judgment, raising three assignments of error: that the trial court erred in (1) admitting as excited utterances the statements of Pelletier, a nontestifying victim, because his unavailability had not been sufficiently established; (2) admitting the eyewitness identifications of defendant by two state witnesses; and (3) failing to give defendant's proposed jury instruction on assessing eyewitness identification evidence. In supplemental briefing, defendant raises two additional assignments, arguing that the trial court plainly erred when it instructed the jury that it could return nonunanimous verdicts and when it entered convictions based on that instruction. In defendant's view, the giving of the instruction is structural error or, alternatively, not harmless error.

We agree that the trial court plainly erred in instructing the jury that it could return a nonunanimous verdict, which requires us to reverse the convictions based on nonunanimous verdicts (Counts 4 and 6). That error, however, does not require us to reverse the convictions that were based on unanimous verdicts (Counts 3 and 5). Because we are reversing and remanding the convictions related to victim Pelletier, and because defendant's challenge to the admission of Pelletier's statements is directed only to those convictions, we need not address that assignment of error. We further conclude that the trial court ultimately did not err in admitting eyewitness identification evidence, although some of its legal conclusions along the way were erroneous in ways that do not compel reversal as to admission of that evidence. Finally, we conclude that the trial court erred in refusing to give defendant's requested jury instruction on assessing eyewitness identification evidence. However, in the

context of the evidence adduced at trial, we conclude that the error was harmless.

We begin by addressing defendant's second assignment, in which he challenges the trial court's admission of eyewitness identification evidence. In reviewing a trial court's admission of such evidence, we defer to the court's findings of fact if they are supported by any evidence in the record. We review the trial court's evidentiary ruling for legal error. *State v. Engle*, 278 Or App 54, 55, 373 P3d 1191, *rev den*, 360 Or 465 (2016). We set out the following facts, as established at the pretrial hearing on defendant's motion to exclude eyewitness identification evidence, consistent with that standard of review. *See State v. Sperou*, 365 Or 121, 137, 442 P3d 581 (2019) (explaining that an appellate court's "review of a trial court's ruling is limited to the record as it had developed at the time of the ruling").

Victims Barney and Pelletier went to visit Phillip Mosttler at his home one night. Phillip's son Xavier[1] was there, along with another person, Rich. As Phillip, Xavier, Barney, and Pelletier were all on the front porch smoking,[2] they saw a woman, later identified as defendant, arguing with and following a man, later identified as Brown, who was shirtless and carrying a backpack. Barney and Pelletier left the porch and began to follow them to make sure the woman was safe and returned shortly thereafter. While the group was on the porch finishing their cigarettes, the woman approached and, standing at the steps to the porch, began yelling at them for meddling in her business. Barney and Pelletier argued with her while Phillip and Xavier were standing "close." The confrontation took place "right there at [the] steps" of the porch. The group eventually walked back into the house away from the woman. While inside, the group began discussing who the woman might be, and someone suggested defendant's name.

Shortly after the group had walked back into the house Barney walked back outside, returned with a stab

_____

[1] Because they share the same last name, for clarity we refer to the Mosttlers by their first names, Phillip and Xavier.

[2] It is unclear from the record whether Rich was also on the porch during these events, but the record contains evidence that she was at the home on the night of the incident.

wound, and said, "she got me." Pelletier then went outside, returned with a stab wound, and said, "she got me." Phillip and Xavier attended to their wounds, and Rich called 9-1-1. Rich gave the operator defendant's name as the woman who had just stabbed Barney and Pelletier.

Officers and paramedics responded to the home. After Barney and Pelletier were transported to the hospital, Deputy Kaber spoke to Phillip and Xavier separately about what had happened while other officers canvassed the neighborhood looking for defendant. Phillip explained what occurred at the home and provided a physical description of the suspect as a "Native American female *** between 5' 5" [and] 5' 7", and 170 pounds, wearing a dark gray or black hooded sweatshirt and jeans." Kaber asked Phillip how the group had come up with defendant's name as the suspect, and he stated that "they all live in a tightknit community *** and were talking about who it could have been ***, and her name was spoken." Although Phillip could not recall who first said defendant's name, he told Kaber "that they had collectively believed that she matched the description and they knew that she lived nearby." Kaber understood that "most of them knew the name more than they knew the person." Kaber next spoke to Xavier, and he gave a "nearly identical" account to Phillip's.

Kaber needed to compare the name given to the 9-1-1 operator with a photograph of that person to ensure that he was sending officers to locate the right person. He brought Phillip and Xavier to his patrol car and, while they were standing together, showed them two photos of defendant on his mobile computer terminal—a Department of Motor Vehicles photo and a larger jail booking photo. He showed them the first photograph and then the other and asked them "if that was *** the person that they had named" and "who they thought was responsible for the stabbing." They both responded that they were "95 percent" sure that she was the same woman who had confronted them on their porch and who they believed had stabbed Barney and Pelletier.

Kaber visited Barney at the hospital that night. Barney confirmed that the person who stabbed him was the

same woman he had seen following the shirtless man earlier in the evening. Kaber asked him if he recognized defendant's name, and he responded that he knew the name only.

Defendant ultimately was charged with a number of crimes for the stabbing of Barney and Pelletier. The defense theory at trial was that someone other than defendant was responsible for the stabbings and that defendant was misidentified as the suspect. Consistent with that theory, defendant moved to exclude the eyewitness identifications by Phillip and Xavier as unreliable, arguing that the state had not met the evidentiary requirements for admissibility under *State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012), including establishing that the witnesses identifications were based on their personal knowledge, OEC 602, or were rationally based on their first-hand perceptions, OEC 701.

Kaber testified at the pretrial hearing on defendant's motion. In addition to the events described above, Kaber explained that, when he arrived at the home, the scene was chaotic, but that Phillip and Xavier were "very cool, very even." Kaber explained that "[t]here was some alcohol involved" but not "anything that [he] thought was in excess." Kaber noted that it was dark out that night and that the single streetlamp on the road did not provide any ambient light where the incident occurred. He explained that Phillip's home is "pretty dark" because it sits on a corner and that "most of the light provided was out of the one light that was on the porch of [Phillip's] home."

Kaber also testified that, about 20 minutes before Rich called the police, a man, Brown, had also called the police to report that defendant had tried to stab him with a fork. Kaber spoke to Brown, who confirmed that he was at defendant's home when the fight with defendant broke out. Although Brown couldn't recall the exact address, Kaber ultimately determined that the home was located a few homes away from Phillip's house. Brown also confirmed that defendant had been chasing him down the street and that he was shirtless and carrying a backpack.

Deputy Randall also testified. On the night of the incident, Randall went to defendant's home and spoke to her

father, Allen. Allen told him that about 10 minutes before the ambulance showed up down the street, defendant had walked into the house and told him that "a guy had put hands on her and that she had stabbed him."

In response to defendant's challenge to the admission of the identification evidence, the state first argued that *Lawson/James* did "not apply in this situation," because, unlike in that case, which focused on suggestive police conduct in the process of obtaining a name for a suspect, here the officers had received the name of the suspect before any police action. The state further argued that, in any event, even if *Lawson/James* did apply, the state had met its burden to prove the admissibility of the identifications by Phillip and Xavier and defendant had failed to show that the probative value of those identifications was substantially outweighed by the dangers of unfair prejudice because they were corroborated by Brown and defendant's father.

Defendant responded that the *Lawson/James* test did apply and that the state had failed to establish the admissibility of Phillip's and Xavier's identifications. Defendant argued that the state had failed to establish that the "linking of [defendant's] photograph with what they actually saw" was reliable and based on their own personal observations or perceptions. According to defendant, because neither Phillip nor Xavier actually came up with defendant's name but, rather, an unnamed person in the group did, it is unknown whether their identifications were based on their perceptions or on "hearsay" from the group discussion. Further, defendant contended that Kaber showing two single photographs of defendant while Phillip and Xavier were standing next to one another was suggestive. Defendant also argued that the probative value of the evidence was substantially outweighed by the dangers of unfair prejudice because, given its unreliability, its probative value was low, and that the witnesses' statements that they were "95 percent" certain that defendant was the assailant had potential to influence and mislead the jury.

The trial court orally ruled that

"the fact pattern in this case does not fit within the framework that is in [the *Lawson/James* line of] cases and so

the Court's ruling is that [*Lawson/James* does not] apply. And accepting the State's argument that even * * * if it does apply, that the State has met their burden."

Following its oral ruling, the court issued written findings of fact and an order denying defendant's motion. The court found that the "witnesses all had an adequate opportunity to perceive * * * and did perceive" defendant when she came back to the house to confront them, and that Barney saw her when she stabbed him. The court further found that their identifications were based on their own perceptions and not based on suggestive police procedures. Regarding OEC 403 balancing, the written findings stated:

> "[U]nder *Lawson*, the court must do an OEC 403 balancing test to determine if the probative value of the evidence is substantially outweighed by unfair prejudice. The state argued that in light of all of the other evidence establishing that the defendant was the person who stabbed the two victims, the probative value of the introduction of the identification testimony would not be substantially outweighed by any risk of unfair prejudice."

The written order concluded, again, that *Lawson/James* did not apply but, even if it did, "the state has satisfied its burden for the admission of the identification evidence."

The case proceeded to a jury trial. Pelletier and Xavier did not testify. Phillip testified that the woman in the photos that Kaber showed him on the night of the incident was the same woman who had approached and confronted the group before Barney and Pelletier were stabbed and that he had "no doubt" that defendant was that same woman. Kaber testified that he showed Phillip and Xavier photos of defendant and that they both confirmed that she was the person who they believed had stabbed Barney and Pelletier. Finally, Barney testified that defendant was the woman who had stabbed him. As noted, the jury unanimously found defendant guilty of second-degree assault (Count 3) and UUW (Count 5) related to the stabbing of Barney, and guilty by nonunanimous verdict of first-degree assault (Count 4) and UUW (Count 6) for the stabbing of Pelletier.[3]

---

[3] The jury found defendant not guilty of two counts of attempted murder (Counts 1 and 2).

In reviewing admission of the identification evidence, we begin with a brief overview of *Lawson/James*, in which the Supreme Court established the framework for determining the admissibility of eyewitness identification evidence. In *Lawson/James*, the court explains that "when a criminal defendant files a pretrial motion to exclude eyewitness identification evidence, the state—as the proponent of the eyewitness identification—must establish all preliminary facts necessary to establish admissibility" under the applicable provisions of the Oregon Evidence Code. 352 Or at 761. If the pretrial challenge implicates OEC 602[4] or OEC 701,[5] it is the state's burden to provide "proof under OEC 602 that the proffered eyewitness has personal knowledge of the matters to which the witness will testify, and proof under OEC 701 that any identification is both rationally based on the witness's first-hand perceptions and helpful to the trier of fact." 352 Or at 761-62. If the state satisfies its burden, the burden then shifts to the defendant to prove "under OEC 403[6] that, although the eyewitness evidence is otherwise admissible, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." *Id.* at 762. If the defendant meets that burden, the court has discretion to either exclude the identification or implement another remedy short of exclusion. *Id.*

*Lawson/James* set forth two categories of factors that affect the reliability, and thus probative value, of eyewitness identification evidence: estimator variables and

---

[4] OEC 602 provides:

"Subject to the provisions of Rule 703 (ORS 40.415), a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness."

[5] OEC 701 states that the testimony of a nonexpert witness must be "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of testimony of the witness or the determination of a fact in issue."

[6] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

system variables. Estimator variables are the "characteristics of the witness, the alleged perpetrator, and the environmental conditions of the event that cannot be manipulated or adjusted by state actors." *Id.* at 740. Estimator variables include the witness's level of stress; the witness's attention; the duration of exposure; environmental viewing conditions; the witness's physical and mental characteristics; the witness's description of the perpetrator; the perpetrator's characteristics; the speed of the identification; the witness's confidence or certainty (which is not a reliable indicator of accuracy); and memory decay. *Id.* at 744-46.

System variables are the "circumstances surrounding the identification procedure itself that are generally within the control of those administering the procedure." *Id.* at 740. System variables include factors such as whether the identification procedure was conducted by a person who was unaware of the suspect's identity; whether pre-identification instructions were given to reduce the likelihood of misidentification; the method used to construct and administer the photograph lineup to the witness; whether multiple viewings of the suspect led to source confusion; whether suggestive wording or leading questions by investigators contaminated the witness's memory; and whether post-identification confirming feedback falsely inflated the witness's confidence in the accuracy of his or her identification. *Id.* at 741-44.

On appeal, defendant argues that the trial court erred in three ways when it failed to exclude Phillip's and Xavier's out-of-court identifications of defendant and Phillip's in-court identification. First, according to defendant, the court erred when it ruled that the *Lawson/James* analysis did not apply because it applies when, as here, the state administers suggestive pretrial procedures.

Second, defendant argues that the court erred when it alternatively ruled that the state had met its burden to establish the admissibility of the eyewitness identifications under OEC 602 and OEC 701. Defendant notes that Phillip and Xavier did not testify at the hearing, and Kaber testified to only the "bare facts." Regarding OEC 602, defendant contends that Kaber's testimony did not establish facts from

which a jury could find that Phillip and Xavier had an adequate opportunity to observe, and did observe, the woman in the street so that they could identify her based on their personal knowledge. Specifically, defendant asserts that there was no evidence to establish that they had a good view of the woman because the street was poorly lit; there was no evidence presented that the porch light was on or how long or carefully Phillip and Xavier observed the woman; Phillip's vague description of the woman and Xavier's lack of any description indicates that they did not "pay that much attention to any identifying characteristics"; and Kaber's testimony indicated that Phillip and Xavier might have been intoxicated.

Regarding OEC 701, defendant argues that the state failed to adduce sufficient evidence to establish by a preponderance that Phillip's and Xavier's identifications were rationally based on their own perceptions rather than on a suggestive identification procedure. According to defendant, the identification procedure was suggestive because Kaber's presentation of defendant's photos was akin to the inherently suggestive "suspect show-up" procedure. *See Lawson/James*, 352 Or at 742-43 (defining a "showup" as presenting an eyewitness with a single suspect for identification and noting that showups are "generally regarded as inherently suggestive—and therefore less reliable"). Compounding the procedure's suggestiveness, defendant continues, are the facts that Phillip and Xavier had already decided from their conversation with the group that defendant was the woman whom they had seen earlier; before being shown the photographs, Kaber "readily accepted" that group identification when he showed the men only photographs of defendant and no other potential suspects; and Phillip and Xavier viewed the photographs and made the identifications together. Thus, according to defendant, because the state failed to adduce sufficient facts that Phillip's and Xavier's personal observations were sufficient to identify defendant, and given the highly suggestive identification procedure used, the state did not meet its burden to establish the admissibility of their out-of-court eyewitness identifications.[7] And,

_____

[7] Defendant does not challenge that the eyewitness identifications would be helpful to the jury as required under OEC 701, obviating the need for us to address that part of the analysis.

defendant continues, because Phillip's in-court identification relied on his pretrial identification, it was similarly unreliable under OEC 602 and OEC 701.

Third, defendant argues that the trial court erred when it failed to conduct the requisite OEC 403 balancing and, as an alternative to his other requested remedies, asks for a limited remand to allow the court to conduct the balancing.

The state responds that the trial court did not err in ruling that the *Lawson/James* test does not apply. Before the trial court, the state argued that *Lawson/James* was not implicated because Kaber had received defendant's name from the witnesses *before* police contact and not *as a result of* any suggestive police conduct. On appeal, adjusting its argument, the state's view is that Phillip and Xavier knew defendant and that the only identification problem was "in *attaching a name*" to defendant's face, which is "not the sort of eyewitness identification that is subject to the *Lawson/James* analysis." (Emphasis in state's brief.) In the state's view, it is "completely irrelevant" whether a witness knows a suspect's name if the witnesses can positively identify the person as the suspect. In any event, the state contends, even if *Lawson/James* applies, the trial court did not err in ruling that it met its burden to establish the admissibility of the eyewitness identifications. The state does not respond to defendant's argument that the court failed to conduct OEC 403 balancing.

Although we conclude that the trial court erred in ruling that the *Lawson/James* test did not apply, we nonetheless conclude that the state met its burden to establish that the eyewitness identifications were based on the witness's personal observations and perceptions. We further conclude that, contrary to defendant's argument, the record establishes that the trial court conducted the required OEC 403 balancing.

We begin with the applicability of the *Lawson/James* framework. The state's argument before the trial court was that, when the police obtain a suspect's name from a witness, the eyewitness identification precedes police questioning or state-administered identification procedures

and, thus, as we understand it, cannot be the result of suggestive police procedures implicating the *Lawson/James* test. However, that view misunderstands the test.

Eyewitness identification evidence is the function of two variables—memory and perception—and the focus of the *Lawson/James* framework is on determining the reliability of the eyewitness identification. *See Lawson/James*, 352 Or at 740 (looking to "scientific knowledge and empirical research concerning eyewitness perception and memory" to establish the framework for assessing the reliability and admissibility of eyewitness identification evidence). Regarding memory, the concern with eyewitness identifications is that a witness's original memory of an event may be tainted by some other source, thus rendering the identification unreliable. *See id.* at 748 ("[O]nce contaminated, a witness's original memory is very difficult to retrieve; it is, however, only the original memory that has any forensic or evidentiary value."). Although suggestive police conduct is one source of memory contamination, it is not the only source identified in *Lawson/James*. *See id.* at 753 ("[M]any of the reliability concerns surrounding eyewitness identification evidence stem from the basic premise that eyewitness testimony can be led or prompted by suggestive identification procedures, suggestive questioning, and/or memory contamination *from other sources*." (Emphasis added.)); *id.* at 743 (explaining that one source of memory contamination is the way in which witnesses may "converse about an event"); *see also* Christian Sheehan, *Making the Jurors the 'Experts': The Case for Eyewitness Identification Jury Instructions*, 52 B. C. L. Rev. 651, 653 (2011) ("Many inaccurate identifications are caused not by any police actions, however, but rather by psychological factors that affect perception and memory."). In fact, as we have previously explained:

> "In *Lawson/James*, the court held that the threshold inquiry from *Classen*—whether there had been suggestive police procedures—was unnecessary as a preliminary and independent inquiry: 'There is no reason to hinder the analysis of eyewitness reliability with purposeless distinctions between suggestiveness and other sources of unreliability.'"

*State v. Wesley*, 254 Or App 697, 711, 295 P3d 1147, *rev den*, 354 Or 62 (2013) (quoting *Lawson/James*, 352 Or at 747). Thus, whether the police involvement in this case could be considered suggestive is not the dispositive question in determining whether to apply the test outlined in *Lawson/ James*. Whether a particular case involves suggestive police conduct, and, if so, how it might have affected the witness's memory, is simply one factor the court must consider in determining the admissibility of the eyewitness identification evidence—it is not a prerequisite to applying the *Lawson/James* test. *See State v. Hickman*, 355 Or 715, 726-49, 330 P3d 551 (2014), *cert den*, 577 US 896 (2015) (applying *Lawson/James* test in determining the admissibility of in-court identifications where there was "no suggestive pretrial procedures" or any attempt to have the witnesses identify the suspect before trial).

The state's argument on appeal is somewhat different, and we address it only briefly. We understand the state to argue that the *Lawson/James* framework is not implicated because the witnesses knew defendant and, thus, the identification evidence was not memory-based. We reject that argument. Defendant's motion to exclude the eyewitness identifications raises a number of challenges to the identifications' reliability, including whether they were based on Phillip's and Xavier's personal knowledge, OEC 602, or their own perceptions, OEC 701, or were adversely impacted by co-witness contamination, suggestive identification procedures, or environmental conditions surrounding the event. Those challenges are precisely the type of issues that implicate the *Lawson/James* test. *See Lawson/James*, 352 Or at 761-62 (explaining that, when "an issue raised in a pretrial challenge to eyewitness identification evidence specifically implicates OEC 602 or OEC 701," it is the state's burden to establish the foundational facts required under OEC 602 and OEC 701). What effect the witness's familiarity with the suspect has on the reliability of the identification, like whether suggestive police procedures were used, is simply one of the many factors to consider in assessing the reliability of the eyewitness identification. *See State v. Calia*, 15 Or App 110, 114-15, 514 P2d 1354 (1973), *cert den*, 417 US 917 (1974) (concluding that the defendant's proposed

eyewitness instruction, which included instructing the jury that it should consider the witness's familiarity with the defendant, to be a correct statement of the law); *United States v. Telfaire*, 469 F2d 552, 558 (DC Cir 1972) (providing example of eyewitness-identification jury instruction that includes considering "whether the witness had had occasion to see or know the person in the past"); *State v. Ollison*, 16 Or App 544, 550, 519 P2d 393 (1974) (referring to *Calia*, 15 Or App 110, and *Telfaire*, 469 F2d 552, as examples of correct eyewitness-identification jury instructions). Therefore, the trial court erred in ruling that the *Lawson/James* test did not apply.

Nonetheless, we conclude that the state met its burden to establish the foundational admissibility requirements, the first step in the *Lawson/James* test. Beginning with defendant's OEC 602 challenge, the state presented sufficient facts to permit a reasonable juror to find that Phillip and Xavier made the observations necessary to identify defendant from the photos. The evidence showed that, while Barney and Pelletier were arguing with defendant on the front porch, Phillip and Xavier were standing on the porch next to Barney and Pelletier and "close" to the confrontation, and that the woman was standing "right there" at the steps of the front porch. That evidence allows an inference that Phillip and Xavier were close enough to view the woman's facial and physical features. *See Lawson/James*, 352 Or at 766 ("[W]itnesses were face-to-face with the perpetrators and had clear opportunities to observe their features[.]").

Further, based on those close-range observations, Phillip provided Kaber with a relatively thorough physical description of defendant shortly after the incident, including that she was between 5'5" and 5'7", weighed 170 pounds, and was wearing a dark gray or black hooded sweatshirt and jeans.[8] *See Lawson/James*, 352 Or at 745 ("Accurate identifications generally tend to be made faster than inaccurate identifications."); *State v. Collins*, 256 Or App 332, 344, 300 P3d 238 (2013) (accepting the trial court's finding that a "complete description" was provided, which included the suspect's "race, stature, and hair color"); *but see Lawson/*

---

[8] Defendant does not challenge the accuracy of that physical description.

*James*, 352 Or at 745 ("Contrary to a common misconception, there is little correlation between a witness's ability to describe a person and the witness's ability to later identify that person."). Although Phillip also described the woman as "Native American," he provided no detail about what specific facial or physical features he was intending to identify with that descriptor and, in these circumstances, we do not rely on that aspect of his description in our analysis. *See Lawson/James*, 352 Or at 755 ("[N]onfacial features like race, height, weight, clothing, or hair color, generally lack the level of distinction necessary to permit the witness to identify a specific person as the person whom the witness saw."). And, although the scene was chaotic, Kaber testified that Phillip and Xavier were "very cool, very even." The record is therefore sufficient to support the trial court's factual determination that the witnesses had an adequate opportunity to perceive and did perceive the facts necessary to support their identifications of defendant.

Defendant challenges Phillip's and Xavier's ability to personally observe the woman at the stairs because it was dark out and, she contends, there was no evidence that the porch light was on. That is one way to view the evidence—but it is not the only way to view it. Kaber testified that "most of the light provided was out of the one light that was on the porch of [Phillip's] home." Although there was no evidence indicating with certainty that the light was on at the time of the events, Kaber's testimony allows for an inference that it was. Defendant also argues that Phillip and Xavier might have been drinking. However, Kaber's testimony that, although there "was some alcohol involved," it was not "anything that [he] thought was in excess," supports the trial court's implicit finding that alcohol did not adversely affect their personal observations. Defendant further contends that there was no evidence establishing how long or how carefully Phillip and Xavier had observed the woman at the stairs. Although there was no evidence presented in that regard, the evidence that was presented, including that they were standing "close" to the woman during the confrontation and that Phillip provided a relatively thorough description of the woman shortly after the incident, was sufficient to allow a jury to conclude that Phillip and Xavier had

personal knowledge of defendant's identity. *See Hickman*, 355 Or at 729 ("[A]n identification satisfies OEC 602 if the eyewitness testifies to facts that, if believed, would permit a reasonable juror to find that the eyewitness observed the facts necessary to make the identification.").

As for the OEC 701 inquiry, we conclude that the state met its burden to show that the witnesses' identifications were rationally based on their own perceptions. Defendant argues that the police showup used in this case was inherently suggestive. Although a photo showup like the one Kaber used is generally problematic and can be inherently suggestive, we conclude that it was not so here. First, because the witnesses provided defendant's name to the 9-1-1 operator, Kaber was not communicating to Phillip and Xavier whom the *police* had targeted in the pursuit of identifying a suspect, which is the primary concern with showups. *See Lawson/James*, 352 Or at 783 ("Showups are widely regarded as inherently suggestive—and therefore less reliable than properly administered lineup identifications— because the witness is always aware of who *police officers* have targeted as a suspect." (Emphasis added.)). Rather, Kaber showed Phillip and Xavier a photo of the woman to verify that the police were apprehending the correct person whom *the witnesses* believed was the suspect. Second, the showup here was done shortly after the incident, which makes it more likely to be reliable. *See id.* at 743 ("A showup is most likely to be reliable when it occurs immediately after the witness has observed a criminal perpetrator in action because the benefit of a fresh memory outweighs the inherent suggestiveness of the procedure."). Third, even assuming that defendant's name was first spoken by a co-witness other than Phillip or Xavier, other factors allow for the inference that their identifications were nonetheless based on their own perceptions, including that Phillip provided a physical description of the suspect after the incident independent of the suspect's name, which included her height, weight, and clothing; they had a close view of the suspect's face; and Phillip and Xavier had seen defendant in the neighborhood before and had some familiarity with her.

Further, Phillip's and Xavier's identifications were corroborated by other evidence establishing defendant as

the perpetrator. First, in a phone call to the police 20 minutes before the 9-1-1 call, Brown reported that defendant had been involved in another confrontation nearby, which confirmed defendant's presence in the neighborhood. In addition, Brown's report that defendant was chasing him down the street in the neighborhood while he was shirtless and carrying a backpack corroborated certain details that Phillip and Xavier provided to the police about the events leading up to the stabbing, as well as defendant's identity. Second, the record established that, 10 minutes before the ambulance arrived, defendant walked into her home and told her father that "a guy had put hands on her and that she had stabbed him," further corroborating Phillip's and Xavier's identifications of defendant as the perpetrator. Thus, the accuracy of Phillip's and Xavier's photo identification of defendant as the woman who had confronted them earlier and whom they believed had stabbed the victims was corroborated by other evidence. *See Lawson/James*, 352 Or at 733-34; 767 (concluding that details provided by the eyewitnesses, including items stolen and found on suspects, and the suspect's clothing, confirmed their identifications); *Collins*, 256 Or App at 335 (concluding that the defendant's response to the police when they told him that they planned to show the victim a photo of the defendant corroborated the victim's identification of the defendant where he stated, "'Of course [the victim] will recognize me. I was there.'"). As such, the state met its burden to show by a preponderance of the evidence that the witnesses' out-of-court identifications were based on their personal knowledge, OEC 602, and perceptions, OEC 701. Because defendant's argument regarding the unreliability of Phillip's in-court identification rests entirely on the asserted unreliability of the out-of-court identification, we come to the same conclusion regarding Phillip's in-court identification. Therefore, the trial court did not err in concluding that the state met its burden to establish the reliability of the identifications.

We turn next to the second step under the *Lawson/James* framework—the required OEC 403 balancing. Defendant does not argue that the trial court abused its discretion in conducting the OEC 403 balancing test. Rather, defendant argues that the trial court failed to conduct any

balancing at all. We disagree. The trial court's written findings, viewed in light of the parties' arguments, reflect that the court conducted OEC 403 balancing. *See State v. Anderson*, 363 Or 392, 406, 423 P3d 43 (2018) ("A court will make a sufficient record [of balancing the OEC 403 factors] if the trial court's ruling, considered in light of the parties' arguments, demonstrates that the court balanced the appropriate considerations.").

In defendant's memorandum to the trial court, she argued that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice because the identifications were unreliable and the witnesses statements that they were "95 percent" certain of defendant's identity had potential to influence and mislead the jury. Before the presentation of evidence at the pretrial hearing, the trial court sought clarification on who had the burden of proof, and defendant responded, "once the State meets [its] burden[] under 602 and 701, then the burden shifts for prejudice." Further, during the pretrial hearing, defendant alerted the court that she had concerns about the state eliciting testimony on the substance of Brown's conflict with defendant. The state responded that it was trying to "discount[] the 403 issue over the prejudicial. I think it is important to find out what the officers did with the information they had to confirm that this identification was correct *** in anticipation of the 403 argument." The court allowed the testimony. Additionally, defendant later objected to the state eliciting testimony about defendant's inculpatory statements to her father after the stabbings. The state responded that the evidence goes "to the 403 weighing test that must be done." The court overruled the objection. Lastly, during argument, the state contended that "the 403 balancing test would be in favor of the State *** because there is the external evidence to confirm these identifications." Specifically, the state argued, "[w]e had the call that came in prior regarding *** Brown, he confirmed that he was the guy that had his shirt off, he was being chased by [defendant]; we have the statements from the father."

The court's written findings and order noted that it "must do an OEC 403 balancing test to determine if the

probative value of the evidence is substantially outweighed by unfair prejudice." It further referenced the state's argument that "in light of all of the other evidence establishing that the defendant was the person who stabbed the two victims, the probative value of the introduction of the identification testimony would not be substantially outweighed by any risk of unfair prejudice."

The record shows that the trial court conducted OEC 403 balancing. Defendant argued that the eyewitness identifications had little probative value because they were unreliable and identified prejudicial risks of the evidence. *See Lawson/James*, 352 Or at 757 (nothing that the persuasive force, or probative value, of eyewitness identification testimony is directly linked to its reliability). The state disagreed, highlighting that the eyewitness identifications were corroborated by other evidence. Further, the court's written order expressly noted that it was required to conduct an OEC 403 balancing, and it identified the correct legal standard and the state's argument regarding the probative nature of the evidence. We acknowledge that the court's written order does not expressly identify the unfairly prejudicial effect of the evidence or how it balanced the relevant OEC 403 factors, and it refers to the state satisfying its burden for the admission of the identification evidence where defendant has the burden under OEC 403. However, on this record, in light of the parties' arguments, its written findings and order establish that the court conducted OEC 403 balancing. *See Anderson*, 363 Or at 409 ("[I]n assessing the sufficiency of a trial court's explanation of its OEC 403 ruling, appellate courts should consider the trial court's ruling in light of the arguments that the parties made on the merits of the issues raised by an OEC 403 objection, as well as whether either party asked the court to provide a more complete explanation of its ruling."). As noted, because defendant does not argue that the trial court abused its discretion in conducting OEC 403 balancing, we do not address the merits of the balancing.

We turn to defendant's third assignment, in which she argues that the trial court erred in failing to give her requested jury instruction on eyewitness identification evidence. We review "a trial court's refusal to give a requested

jury instruction for errors of law." *State v. McNally*, 361 Or 314, 320, 392 P3d 721 (2017). "In determining whether evidence supports giving the defendant's proposed instruction, we view the facts in the light most favorable to giving that instruction." *State v. Roberts*, 293 Or App 340, 341, 427 P3d 1130 (2018). Further, in assessing the harmlessness of any error, we look to the trial record as a whole. *State v. Prieto-Rubio*, 262 Or App 149, 155, 324 P3d 543 (2014), *aff'd*, 359 Or 16, 376 P3d 255 (2016). We provide the following facts accordingly.

During trial, defendant contested the sufficiency of the evidence to establish that she was the person who had stabbed the victims. The parties focused their witness examinations and arguments on the circumstances surrounding the identifications of defendant by Phillip, Xavier, and Barney. Although that evidence was largely consistent with the evidence that was developed at the pretrial hearing, it was more developed on certain legal points. Kaber's testimony, for example, established the timeline of events: he was dispatched to the home at 9:39 p.m. and arrived at 10:04 p.m., and he departed for the hospital at 11:10 p.m. Kaber also confirmed that defendant lived on the same block as Phillip.

Phillip's more developed or varying testimony included that he had not been drinking; that the confrontation at the porch lasted one and a half to two minutes; that he could see the woman very clearly during the confrontation because his porch is "really, really small" with "three little tiny steps," and she was standing three to four feet away from him; and that, although his street is dark, his porch light is bright. Further, although he recalled giving Kaber a physical description of the woman on the night of the incident, he could not recall the details that he provided to him; he acknowledged that someone else in the group who he could not recall had suggested defendant's name after the incident, but he nonetheless recognized the woman's face because he knew she had been staying next door and had "seen her walking up and down the street a few times"; after Kaber showed him and Xavier defendant's photograph, they were both "95 percent sure" it was the same woman, and he had "no doubt" that defendant was the same woman.

Barney's testimony also was more developed at trial. He testified that he was intoxicated on the night of the incident; that when he and Pelletier had followed the couple to ensure the woman's safety, she became upset and an argument ensued, which continued until the three arrived at Phillip's front porch; that the porch light was on; that during that argument, which lasted a total of two to four minutes, Barney ended up face-to-face with the woman—who at this point he recognized but did not know her name—and he pushed her to the ground twice. Further, he testified to being six to eight inches taller than the woman; that someone other than Barney first suggested defendant's name after the group left the porch and went back inside the home; that Barney went back outside and got into a second confrontation with the woman and, while standing face-to-face, she stabbed him; that, at the time she stabbed him, he had no doubt that it was the same woman from the earlier confrontation because, although she was wearing a black hoodie with the hood up, he could still see her face and he recognized the white design on the black sweatshirt; and that he knew her face because he had seen it before, including in photos with his brothers. After being shown Kaber's police report to refresh his memory, Barney testified, "I'm pretty, I'm positive [the woman] said *** something about putting your hands on a woman or I think that was all that was really said," which he understood to be a reference to when he pushed her.

The court excluded any details of Brown's call but allowed Kaber to testify that a separate 9-1-1 call had come in involving defendant, the time of that call, and that defendant's address in the neighborhood was subsequently located. Defendant's inculpatory statements to her father did not come in at trial.

During closing argument, both the state and defendant focused on the evidence surrounding the reliability of identifications of defendant as the perpetrator by Phillip, Xavier, and Barney. Defendant argued that, in considering the weight to give to the eyewitness statements, the jurors should consider the witnesses' "unfamiliarity with [defendant], but also the environment." Defendant emphasized that the scene was chaotic, it was dark out,

the street was poorly lit, and that both Phillip and Barney received defendant's name from someone else in the group. Regarding Phillip, defendant challenged his ability to sufficiently see the assailant during the confrontation before the stabbing because of the distance between the two at the porch. Regarding Barney, defendant challenged his ability to observe his assailant, arguing that her hood was up during the final confrontation; Barney had been drinking, which affects a person's judgment and memory; he was emotional from the confrontation; and the angle between the two was "not face-to-face" because Barney is taller than the woman. Defendant challenged the amount of time that Barney and Phillip had to observe the woman, arguing that each confrontation happened quickly. Defendant also challenged Kaber's photo-presentation procedure, noting that Phillip learned defendant's name from the group before he viewed the photos, and then Kaber, having received defendant's name as the suspect, showed Phillip a single photo of defendant instead of multiple photos of potential suspects. Defendant asked the jurors to think about whether "what came out of both [Barney's and Phillip's] mouth[s were] from their own thought process, from their own witnessing, from their own piecing things together and not from somebody else that gave them the name."

The parties discussed how the jury should be instructed. Defendant requested a special jury instruction regarding eyewitness identification testimony, citing *Lawson/James*, 352 Or 724. Defendant's requested jury instruction is the Ninth Circuit Model Criminal Jury Instruction 4.11 Eyewitness Identification (MCJI 4.11), and states:

"You have heard testimony of eyewitness identification. In deciding how much weight to give to this testimony, you may consider the various factors mentioned in these instructions concerning credibility of witnesses.

"In addition to those factors, in evaluating eyewitness identification testimony, you may also consider:

"(1)  the capacity and opportunity of the eyewitness to observe the offender based upon the length of time for observation and the conditions at the time of observation, including lighting and distance;

"(2)   whether the identification was the product of the eyewitness's own recollection or was the result of subsequent influence or suggestiveness;

"(3)   any inconsistent identifications made by the eyewitness;

"(4)   the witness's familiarity with the subject identified;

"(5)   the strength of earlier and later identifications;

"(6)   lapses of time between the event and the identification[s]; and

"(7)   the totality of circumstances surrounding the eyewitness's identification."

Defendant argued that the standard jury instruction for assessing eyewitness testimony was not specific enough and that her requested special instruction would help the jury understand how to assess eyewitness identification evidence. The state responded that the jury instruction was inappropriate because the *Lawson/James* framework did not apply and that the instruction amounts to an improper comment on the evidence.[9] The court denied defendant's request, concluding that, although it "was a close issue" and the requested instruction was "neutral," it was unnecessary.

Upon agreement of the parties, the court provided several uniform jury instructions (UCrJI) to guide the jury on how to evaluate the evidence. The court instructed on UCrJI 1006, evaluating witness testimony, which states:

"The term '*witness*' includes every person who has testified under oath in this case. Every witness has taken an

_____

[9] The state also alerted the court that the comment to the MCJI 4.11 Ninth Circuit jury instruction "recommended against giving of an eyewitness identification instruction." However, we note that that MCJI 4.11 comment no longer contains that recommendation. *See* Ninth Circuit Jury Instructions Committee, *Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit* § 4.11 cmt. (2010) (approved June 2019); *United States v. Valencia-Cortez*, 769 F Appx 419, 422 (9th Cir 2019) (explaining that the court was "troubled by the comment" to the MCJI 4.11, which recommends "'against the giving of an eyewitness identification instruction,'" and "encourage[d] the Jury Instructions Committee to reassess their comment as it is inconsistent with legal precedent and growing scientific evidence").

oath to tell the truth. In evaluating each witness's testi-
mony, however, you may consider such things as:

> "(1)   The manner in which the witness testifies.

> "(2)   The nature or quality of the witness's testimony.

> "(3)   Evidence that contradicts the testimony of the witness.

> "(4)   Evidence concerning the bias, motives, or interest of the witness."

(Emphasis in original.) The court also instructed on UCrJI
1008 and UCrJI 1025. UCrJI 1008, inferences, states:

> "In deciding this case you may draw inferences and
> reach conclusions from the evidence, if your inferences and
> conclusions are reasonable and are based on your common
> sense and experience."

UCrJI 1025, direct and circumstantial evidence, provides:

> "There are two types of evidence. One is direct evi-
> dence—such as the testimony of an eyewitness. The other
> is circumstantial evidence—the proof of a chain of circum-
> stances pointing to the existence or nonexistence of a cer-
> tain fact. You may base your verdict on direct evidence or
> on circumstantial evidence."

Additionally, consistent with the "Functions of the
Court and Jury" instruction, the court explained that the
jury "must evaluate the evidence to determine how reliable
or how believable that evidence is," and that, in "deciding
this case, you are to consider all the evidence you find wor-
thy of belief." Further, the court stated, "It is your duty to
weigh the evidence calmly and dispassionately and to decide
this case on its merits," and not based on "bias, sympathy, or
prejudice." Finally, the court instructed that "the testimony
of any witness whom you believe is sufficient to prove any
fact in dispute. You are not simply to count the witnesses,
but you are to weigh the evidence."

After the court instructed the jury, defendant
objected to the court's failure to give MCJI 4.11.

On appeal, defendant argues that the trial court
erred in failing to give her special jury instruction because it

accurately stated the law and the evidence supported giving it; she contends that failure to give the instruction, which would have helped the jury assess the evidence related to the critical issue in the case—defendant's identification—likely affected the verdict. The state counters that, even if defendant's proposed instruction was a correct statement of the law and it would have been permissible for the court to give it, the instruction was not necessary. The state argues that the factors listed in defendant's proposed instruction were "common-sense considerations that jurors might choose to apply in the consideration of a witness's testimony," that the uniform instructions the court gave "covered the same ground," and that defendant could argue the same factors to the jury.

A party is generally entitled to a jury instruction on the law that supports that party's theory of the case when "(1) there is evidence to support that theory and (2) the requested instruction is a correct statement of the law." *State v. Harryman,* 277 Or App 346, 356, 371 P3d 1213, *rev den*, 360 Or 401 (2016).

> "However, a trial court does not err in refusing to give a proposed instruction—even if legally correct—if the substance of the requested instruction is covered fully by other jury instructions given by the trial court or if the requested instruction is not necessary to explain the particular issue or point of law to the jury."

*Id.* at 356 (internal quotation marks and ellipses omitted). We conclude that the trial court erred in failing to give defendant's requested jury instruction.

Beginning with whether the facts supported giving the instruction, we readily conclude that they did. Defendant challenged the witness identifications based on a number of factors related to the reliability of the identification evidence, including that Phillip's, Xavier's, and Barney's memories of the event could have been contaminated by their discussions with the group and, regarding Phillip and Xavier, that Kaber's identification procedure was problematic, and that their perceptions of the event were adversely impacted due to environmental factors surrounding the event, including that the street was dark and alcohol was involved. The

parties elicited evidence addressing those challenges and, viewing that evidence in the light most favorable to defendant, the record permitted the jury to conclude that certain factors called into question the reliability of the identifications. The record supported giving the instruction.

We further conclude that defendant's proposed instruction was a correct statement of the law. The instruction provided the jury with factors to consider when assessing the weight of the eyewitness identification evidence, including: (1) the "capacity and opportunity of the eyewitness to observe the offender based upon the length of time for observation and the conditions at the time of observation"; (2) "whether the identification was the product of the eyewitness's own recollection or was the result of subsequent influence or suggestiveness"; (3) "any inconsistent identifications made by the eyewitness"; (4) "the witness's familiarity with the subject identified"; (5) "the strength of earlier and later identifications"; (6) "lapses of time between the event and the identifications[s]"; and (7) "the totality of circumstances surrounding the eyewitness's identification." Factors (1), (2), and (6) substantively mirrored the system and estimator variables identified in *Lawson/James* as relevant to assessing the reliability of eyewitness identification evidence. *See Lawson/James*, 352 Or at 741-46 (discussing system variables that are relevant to determining whether an identification was the product of the eyewitness's own recollection or was the result of subsequent influence of suggestiveness, including various suggestive eyewitness-identification procedures or post-identification events; discussing estimator variables that are relevant to a witness's capacity and opportunity to perceive a suspect, including the duration of exposure and environmental viewing conditions; and discussing estimator variables that are relevant to considerations of the lapse of time between the event and the identification, including the speed of the identification and memory decay). Therefore, those factors are a correct statement of the law. *See also Calia*, 15 Or App at 114-15 (concluding that those factors, in largely the same form, were a correct statement of the law).

Further, although factor (4) is not explicitly addressed in *Lawson/James*, a witness's familiarity with a suspect is

relevant to the reliability of an eyewitness identification, as we have discussed. If a witness has seen a suspect previously, the witness may, depending on other relevant circumstances surrounding the identification, be more able to easily identify the person at a later time, further increasing the identification's reliability. That factor is a correct statement of the law. *See Calia*, 15 Or App at 114-15 (concluding that defendant's proposed eyewitness instruction, which included instructing the jury that it should consider the witness's familiarity with the defendant, was a correct statement of the law).

*Lawson/James* did not explicitly include factors (3), (5), and (7) of defendant's proposed instruction as estimator or system variables. However, *Lawson/James* did not foreclose consideration of other factors that may be relevant to determining the reliability of an eyewitness identification. *See Lawson/James*, 352 Or at 740-41 (acknowledging that the research discussed in the opinion was "not intended to preclude any party in a specific case from validating scientific acceptance of further research or from challenging particular aspects of the research described in this opinion"). Moreover, those factors address the relevant considerations that were articulated more broadly in *Lawson/James*. In other words, *Lawson/James* explained how application of certain system or estimator variables that may be present in a case, as applied to the broad considerations articulated in those factors, may indicate either a reliable or an unreliable identification. For example, if an eyewitness made a prior inconsistent identification of a suspect, factor (3), that could indicate that the witness's memory of the event has been altered by memory contamination. *See, e.g.*, *Lawson/James*, 352 Or at 764-65 (concluding that the victim's "statements over time are indicative of a memory altered by suggestion and confirming feedback" where she was unable to identify the defendant from a photograph following the incident but, after she was subjected to several subsequent showings of the defendant and leading questions regarding the defendant's involvement in the crime, the victim ultimately identified the defendant as the perpetrator).

Further, factor (5) instructed the jury that it could consider "the strength of earlier and later identifications" in

assessing the identification evidence. That factor was likely communicating that, if a witness was unable to make, or was uncertain of, an earlier identification, but then later made or became more certain of an identification, that later identification could be viewed with distrust if circumstances adversely affecting the witness's memory of the event were present. *See, e.g.*, *Lawson/James*, 352 Or at 743-44, 788 (describing variables that may affect an earlier and later identification, including (1) viewing a suspect multiple times throughout the course of an investigation, which may result in the "witness's inability to discern the source of his or her recognition of the suspect"; (2) "[p]ost-identification confirming feedback," which "tends to falsely inflate witnesses' confidence in the accuracy of their identifications, as well as their recollections concerning the quality of their opportunity to view a perpetrator and an event"; and (3) "[t]he way in which witnesses are questioned or converse about an event can alter their memory of the evident"). Although factors (3) and (5) lacked clear explanations of how the system and estimator variables should be applied, for example, to assess the strength of earlier and later identifications in assessing the identification's reliability, they were not likely to confuse or mislead the jury. And, for the reasons previously noted, they otherwise correctly stated the law.

Lastly, instructing the jury that it could consider the totality of the circumstances surrounding the identification, factor (7), correctly stated the law. As previously explained, *Lawson/James* did not foreclose consideration of other factors that may be relevant in assessing a witness's memory and perception of an event to evaluate the reliability of an identification, and consideration of any relevant factor would clearly be appropriate. Therefore, for all of those reasons—and the state does not present any argument asserting otherwise—defendant's proposed instruction correctly stated the law.

We next consider whether the generalized jury instructions were sufficient to inform the jury of the variables it should consider in assessing the reliability of eyewitness identification evidence. "A defendant is not entitled,

in every case, to a special instruction that is tailored to the particular facts at issue." *Roberts*, 293 Or App at 346. "In the end, what matters is whether the requested instruction is necessary to adequately inform the jury of the applicable law or to avoid confusing or misleading the jury." *Id.* (internal citation omitted).

The jury was instructed that "[i]n evaluating each witness's testimony," they could consider "[t]he manner in which the witness testifies," "the nature or quality of the witness's testimony," "[e]vidence that contradicts the testimony of the witness," and "[e]vidence concerning the bias, motives, or interest of the witness." The court also instructed the jury that it could "draw inferences and reach conclusions from the evidence if your inferences and conclusions are reasonable and are based on your common sense and experience." Lastly, the jury was instructed that it could consider both direct and circumstantial evidence.

None of those instructions speak to the factors that affect the reliability of eyewitness identification evidence. In fact, although the inferences instruction tells the jurors they may rely on their common sense, many of the assumptions related to the *Lawson/James* factors are contrary to jurors' common understandings of that type of evidence. *See, e.g.*, *Lawson/James*, 352 Or at 745, 778 (explaining that jurors "consistently tend to overvalue" the certainty variable even though it is "not a good indicator of identification accuracy," and "[c]ontrary to a common misconception, there is little correlation between a witness's ability to describe a person and the witness's ability to later identify that person"). Therefore, the generalized jury instructions were not a sufficient substitute for defendant's proposed eyewitness-identification jury instruction. *See Lawson/James*, 352 Or at 759 ("[G]eneralized jury instructions * * * frequently are not adequate to inform factfinders of the factors affecting the reliability of such identifications.").

Because evidence supported giving defendant's proposed jury instruction, it was a correct statement of the law, and the generalized jury instructions did not sufficiently address the complex factors affecting the eyewitness

identification evidence, the trial court erred in failing to give defendant's requested jury instruction.[10]

We must next determine if there was "little likelihood that the particular error affected the verdict[.]" *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). In making that determination, we consider "the instructions as a whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue." *State v. Ashkins*, 357 Or 642, 660, 357 P3d 490 (2015).

As previously noted, the state argued that (1) defendant's proposed instruction included "common-sense considerations that jurors might choose to apply in the consideration of a witness's testimony," (2) the uniform instructions the court gave "covered the same ground," and (3) defendant could argue the same factors to the jury. For the reasons previously explained, we reject the state's arguments that the uniform instructions were a sufficient substitute for defendant's proposed jury instruction and that the jury instruction was not necessary because the factors were "common sense" considerations. We also reject the state's assertion that defendant's closing argument was a sufficient substitute for defendant's proposed jury instructions. *See State v. Payne*, 366 Or 588, 611, 468 P3d 445 (2020) ("'[N]either the sufficiency of the evidence nor the completeness of counsel's arguments concerning that evidence is a substitute for the sufficiency of the instructions.'" (Quoting *State v. Brown*, 310 Or 347, 356, 800 P2d 259 (1990).)). Nonetheless, we conclude that the error was harmless.

Here, defendant's requested instruction included several factors that are relevant to assessing the reliability of eyewitness-identification evidence. However, given the evidence adduced at trial, even viewed in the light most favorable to defendant, there is little likelihood that the jury would have found the identifications to be unreliable.

---

[10] *Cf. State v. Martin*, 290 Or App 851, 857, 417 P3d 505 (2018) (concluding that the trial court did not err in refusing to give the defendant's proposed eyewitness-identification instruction because it was written in a nonneutral way that "drew the jury's attention to certain factors bearing on the lack of reliability of eyewitness testimony").

Therefore, we conclude that the failure to give defendant's jury instruction had little likelihood of affecting the verdict.

Defendant argued in closing that the witnesses did not have a sufficient opportunity to observe the assailant because the confrontations happened quickly, the street was poorly lit and it was dark out, there was too much distance between the assailant and Phillip and Xavier, her hood was up during the second confrontation with Barney, and Barney and the assailant were not face-to-face because Barney was taller. However, contrary to defendant's arguments, the evidence showed that, although the street was poorly lit and it was dark out, Phillip's porch light was bright and on, and Phillip was only three to four feet away from the woman and observed her for up to two minutes during the confrontation. Further, the evidence showed that Barney was face-to-face with the assailant twice: during their first argument, which lasted two to four minutes, he was close enough to push her to the ground twice; and during their second argument, they were close enough for her to stab him and for him to recognize the white design on her sweatshirt. Moreover, Phillip's and Xavier's identifications occurred shortly after the event when their memories were still fresh, and they all had some familiarity with defendant's face because she had been living on Phillip's block. Thus, even acknowledging defendant's arguments that Barney was intoxicated and emotional and the scene was chaotic, there is little likelihood that the jurors would have found the witnesses' identifications of defendant to be unreliable given the totality of the evidence.[11]

Viewed in the light most favorable to defendant, the record is susceptible to an inference that the witnesses may have obtained defendant's name as a result of a conversation with other co-witnesses. Nonetheless, the totality of the evidence suggests that the identifications were based on the witnesses memory and perception and not due to any

---

[11] We also note that, after Barney's memory was refreshed, he testified, "I'm pretty, I'm positive" that the woman said "something about putting your hands on a woman," which he understood to be a reference to him pushing her earlier. Although that testimony expresses some degree of doubt and is not necessary to our conclusion given the totality of the other evidence, if that testimony were credited, it would serve to corroborate and substantially increase the reliability of Barney's identification.

suggestibility. Phillip testified that he knew the assailant's face because she had been staying next door and he had seen her walking down the street a few times, which was corroborated when Kaber learned that defendant lived on the same block. Barney likewise recognized her face because he had seen her in photographs with his brothers. Although they did not know defendant's name, they had seen her face before, which would have increased their ability to identify her features based on their own memory rather than any perceived suggestibility. Therefore, considering the witnesses' familiarity with defendant, in combination with the evidence presented that the witnesses had a sufficient opportunity to observe and did observe the woman, we conclude that there was little likelihood that the jury would have found the identifications to be unreliable had the jury been instructed as defendant requested.

In sum, given the totality of the evidence regarding the reliability of the identifications, viewing that evidence in the light most favorable to defendant, we conclude that the failure to give defendant's requested instruction had little likelihood of affecting the verdict. We pause to emphasize that trial courts in general should readily give properly tailored, case-specific jury instructions when challenges to eyewitness identifications are raised. As *Lawson/James* explained, jurors are not aware of many of the factors that affect the reliability of eyewitness testimony; some of those factors are in fact contrary to common assumptions, and generalized jury instructions, cross-examinations, and closing arguments are often not sufficient to inform jurors of the complex issues related to the reliability of eyewitness identification evidence. 352 Or at 759-61. Further, because studies show that, "[n]ationally, 69% of DNA exonerations—252 out of 367 cases—have involved eyewitness misidentification, making it the leading contributing cause of these wrongful convictions," educating juries on the various factors that affect the reliability of eyewitness identification evidence has never been more important. Innocence Project Staff, *How Eyewitness Misidentification Can Send Innocent People to Prison* (Apr 15, 2020), https://innocenceproject.org/how-eyewitness-misidentification-can-send-innocent-people-to-prison/#:~:text=Nationally%2C%2069%25%20of%20DNA

%20exonerations,based%20exonerations%20involving%20 eyewitness%20misidentification (accessed June 23, 2021). However, for all of the reasons discussed, we conclude that the trial court's error here had little likelihood of affecting the verdict.

We turn to defendant's supplemental assignments of error asserting that the trial court plainly erred in instructing the jury that it could convict defendant by a 10-2 verdict and when it entered convictions based on that instruction. As the state correctly concedes, under *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 1401-08, 206 L Ed 2nd 583 (2020), and *State v. Ulery*, 366 Or 500, 503-05, 464 P3d 1123 (2020), defendant is entitled to a reversal of her convictions on Counts 4 and 6, which were based on nonunanimous verdicts, and we exercise our discretion to correct the error. However, defendant is not entitled to reversal of the remaining convictions based on unanimous verdicts, because the instructional error is not structural and was otherwise harmless beyond a reasonable doubt. *See State v. Kincheloe*, 367 Or 335, 339, 478 P3d 507 (2020), *cert den*, ___ US ___, ___ S Ct ___, ___ L Ed 2d ___, No. 20-8126, WL 2519403 (June 21, 2021); *State v. Flores Ramos*, 367 Or 292, 319, 478 P3d 515 (2020). Because defendant is entitled to a new trial on the counts involving victim Pelletier, Counts 4 and 6, we need not address defendant's assignment of error challenging those convictions based on the admission of Pelletier's statements as excited utterances due to Pelletier's unavailability, as that issue may not arise on remand or, if it does, a different record may develop.

Convictions on Counts 4 and 6 reversed and remanded; remanded for resentencing; otherwise affirmed.