Submitted November 26, 2014, affirmed April 8, petition for review denied September 10, 2015 (357 Or 743)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROBERT DWIGHT STEWART,
*Defendant-Appellant.*

Multnomah County Circuit Court
120230832; A152660

347 P3d 1060

Peter Gartlan, Chief Defender, and Kristin A. Carveth, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Leigh A. Salmon, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Garrett, Judge, and Edmonds, Senior Judge.

GARRETT, J.

**GARRETT, J.**

Defendant appeals his judgment of conviction for one count of compelling prostitution, ORS 167.017, and four counts of promoting prostitution, ORS 167.012. Defendant assigns error to the trial court's denial of his motion to suppress evidence discovered in defendant's vehicle, arguing that the vehicle was unlawfully seized without a warrant. Because we conclude that the admission of the challenged evidence, even if erroneous, was harmless, we affirm.

Portland police investigated defendant on prostitution-related charges over the course of several weeks. Police obtained evidence against defendant on several different occasions. The details of what evidence was obtained at what times are material to our analysis and are, therefore, summarized below.

Over the course of two evenings in January and February 2012, Officer Ruppel observed a woman, Moss, walking along a "high-vice" stretch of 82nd Avenue and exhibiting behavior consistent with prostitution. On the second evening, Ruppel saw Moss borrow a cell phone from an individual in a parking lot and make a call. Shortly afterward, defendant arrived in a white Chevrolet, Moss got in the car, and they left. Another officer stopped defendant for a traffic violation, and Ruppel soon arrived at the location of the stop. Ruppel, who had past experience with Moss, advised her of her *Miranda* rights and proceeded to question her about her suspected prostitution activities. Moss denied having any "dates" and said that defendant was her boyfriend, not her pimp, although her body language caused Ruppel to believe that defendant was, in fact, her pimp.

Ruppel next spoke to defendant, who denied that he was Moss's boyfriend, denied having a sexual relationship with Moss, and denied knowing that she was a prostitute. Defendant allowed Ruppel to look at the text message history on defendant's cell phone. Ruppel observed "tons of text conversations" that were associated only with other phone numbers, not names. Some of the messages were suggestive, to Ruppel, of prostitution activity. For example, one message said, "Are you going to post for me or do I need to post?"

Another read, "I didn't make any $$$," and another referred to defendant as "daddy." According to Ruppel's trial testimony, prostitutes and pimps commonly speak of "posting" advertisements online. He also testified that, in his experience, more than 95 percent of prostitutes refer to their pimps as "daddy." As Ruppel expressed interest in some of the messages, defendant began pressing buttons on the phone. Ruppel, concerned that defendant was attempting to destroy evidence, seized the phone so that he could apply for a search warrant. He then released defendant and Moss.

Portland police continued to investigate defendant's suspected prostitution activities over the next several weeks. They interviewed Moss and another woman, Honeycutt. Both women told police that defendant was their pimp and that defendant drove them to "dates" in his white Chevrolet.

About two weeks after Ruppel stopped defendant, another Portland police officer, Edwards, stopped defendant for another traffic violation. Defendant was driving the white Chevrolet. A woman, Casanova, was in the passenger seat. During a check of defendant's and Casanova's identification, Edwards learned that Ruppel had an open investigation into defendant on suspicion of his involvement in prostitution-related activities. After receiving defendant's consent to search the vehicle, Edwards observed an unopened box of condoms, a number of hotel room keys, and around 25 to 30 prepaid Visa gift cards (gift cards). Edwards issued a traffic citation and released defendant and Casanova.

Two weeks after the Edwards stop, police stopped defendant for another traffic violation. By then, an arrest warrant had been issued for defendant on the charge of promoting prostitution. The officer arrested defendant on the outstanding warrant, but, for reasons that are unclear from the record, did not search or seize defendant's Chevrolet and left it parked on the side of the street. One or two days later, Ruppel noticed the traffic stop report in a police database, ascertained the Chevrolet's location, and drove out to the public street where it was still parked. Ruppel was aware at that time that Edwards had observed condoms, hotel room keys, and gift cards in the Chevrolet during the stop two weeks earlier. Through the windows of the car, Ruppel

observed a hotel room key and some women's clothing. Ruppel had the car towed to a police impound lot.

Several days later, on March 2, 2012, Detective Cui applied for a warrant to search the Chevrolet. The warrant was served on defendant on March 6. Cui also obtained a warrant to search the cell phone that Ruppel had seized from defendant during the first stop. In the Chevrolet, Cui found the following: (1) 17 prepaid gift cards; (2) Honeycutt's cell phone; (3) Honeycutt's digital camera; (4) Honeycutt's shoes and clothing; (5) motel receipts in defendant's and Casanova's names; (6) other cell phones; (7) hotel room keys; (8) a handwritten note describing escort service "packages" with prices and brief descriptions of sexual acts, and part of a call "script" expressing what prostitutes should say in their escort videos and calls; (9) a handwritten note describing how to promote an escort business; (10) a condom; (11) a "Green Dot" prepaid gift card; (12) two pieces of paper, one on Portland hotel stationery with a phone number and handwritten notations reading "3:30 incall half hr," and the other with several phone numbers, Moss's first name, and the notation "$385; and (13) other documents."

Defendant was charged with one count of compelling prostitution and four counts of promoting prostitution. Before trial, defendant filed a written motion to suppress evidence derived from the warrantless seizure of his cell phone, which was ultimately denied. That motion did not address the seizure of defendant's Chevrolet. On the morning of trial, defendant orally moved to suppress the evidence obtained from the Chevrolet. The state objected to the lack of notice under UTCR 4.010 (requiring pretrial motions to be filed 21 days in advance of trial) and complained that the state was not prepared to litigate the motion. Defendant objected to any delay in the trial. The trial court ruled that the motion would be litigated during the course of trial. During a midtrial hearing, the state argued that the warrantless seizure of the Chevrolet was justified by exigent circumstances. The state argued in the alternative that the evidence would have been inevitably discovered.

The trial court denied defendant's motion, concluding that:

"[THE COURT:] [T]he officers' testimony [was] credible and *** the facts in accordance with their testimony relating to the automobile, *** [and the] exception of inevitable discovery does provide a basis for search of the automobile, based on the extensive information known to the police at the time, relating to an ongoing investigation of defendant's role in prostitution. So on that basis, the Court denies defendant's motion."

At trial, in addition to the evidence described above that police obtained from the various traffic stops and the seizure of the Chevrolet, the state presented other evidence against defendant. Because it is relevant to our harmless error analysis, we describe it in detail.

Moss and Honeycutt testified that defendant was their pimp. They testified that defendant would drive them to 82nd Avenue to walk the street, and to locations where prostitution took place. They also testified that defendant orchestrated the process of advertising online by directing the content and paying for the ads. The testimony also established that defendant, Moss, and Casanova registered hotel rooms in each other's names where the women performed prostitution services. Moss and Honeycutt also testified that defendant would threaten verbal and physical abuse if they were not compliant.

Moss also testified that defendant once beat her with his belt because she had not made enough money. After fleeing the hotel, Moss encountered Officers Sharp and Powers and told them that "her pimp had beat her." Sharp testified that Moss "seemed scared," and both officers testified that Moss showed them fresh wounds on her back that they both believed could have come from a belt. Police took photographs of Moss's injuries that day.

A manager for Bancorp Bank, the issuer of the gift cards, testified that the gift cards recovered from defendant's Chevrolet had incurred 110 transactions for $4.50 each with the advertising website Backpage.com. (Moss testified that the ads that she and Honeycutt posted cost "about five bucks" on the Backpage.com site.) The state also introduced records from defendant's "SquareUp" account that corroborated Honeycutt's testimony that she had attempted

to have a client pay her using defendant's SquareUp device (a credit card reader that connects to cell phones to allow for electronic payments).

Cui also testified that, in an interview the morning after defendant's arrest, defendant said that he did not remember ever meeting Honeycutt, that he knew Moss, but had "barely spent any time with her," and that Moss was upset with defendant because "she wanted to be with him and he didn't want to be with her." The state, however, introduced telephone records showing approximately 137 calls made from defendant's telephone to Moss's, and 220 calls made from Moss's phone to defendant's, during several weeks in early 2012. Records also showed approximately 45 calls from defendant's phone to Honeycutt's phone and 44 calls from Honeycutt's phone to defendant's within "roughly three or four days." Cui testified that the search of defendant's phone revealed the same photos used in both Moss's and Honeycutt's online ads, a document regarding "how to optimize your escort business," a script to use when "a john is calling a girl," and a video of Moss standing in the corner of a hotel room while defendant berated her for falling asleep.

According to Cui, although defendant admitted that the memory card from the phone was his, he denied making a video of himself berating Moss, and that if one did exist, it "was fake." The state played that video at trial, which shows Moss and Casanova facing a wall, as defendant, also visible, yells at them. Moss testified that defendant was angry because Moss had fallen asleep the night before instead of working. In the video, defendant says:

> "I told you we're a motherfucking business, man. We don't got time for motherfucking playing. You see why last night I told you, bitch, we're about business, not pleasure, bitch. And you made last night, bitch, all about motherfucking pleasure. Bitch, what you got to find out today, bitch, it's all about business, because you got to be working all day, bitch. You, you understand? You're motherfucking sleeping up in here, bitch. Knock the fuck out this shit."

Finally, the state introduced another video at trial, found on Moss's phone, in which Moss reads aloud a script

detailing her "exotic and erotic menu" of prostitution services. Moss testified that defendant wrote down "what to say" in the video.

Defendant sought to impeach the credibility of Moss and Honeycutt with evidence that they made prior statements to police that were inconsistent with their trial testimony. Defendant also argued that Moss and Honeycutt were willingly engaged in prostitution, and that he had not compelled either of them to do so. Defendant introduced a social media message exchange between Moss and Honeycutt from January 16, which read, in part:

"[MOSS]:   What's up, girl? What [you] doing?

"[HONEYCUTT]:   Bored and sittin[g] in bed. [You]?

"[MOSS]:   Trying to get [you] on my team. ***

"[HONEYCUTT]:   Y[o]ur team. ***

"[MOSS]:   Yea[h], girl. We touchin[g] down on some real money. ***

"[HONEYCUTT]:   Like [for] doing what, [because] I might be down...***

"[MOSS]:   Hoeing."

Defendant argued that this correspondence proved that Honeycutt had "perjured herself" and that she "knew that she was going to be a ho. *** And yet she sat up on the stand and played a role and acted like suddenly a heavy force came down on her and she had no other option[.]" Defendant also asserted that Moss had long been a prostitute with "a drug habit." He argued that the court should "toss out" the testimony of Moss and Honeycutt because it was "entirely inconsistent." Defendant also argued that even though he was "in possession" of the prepaid debit cards, that the state did not "know whose account they went to, [or] who did it" and that the SquareUp records were "empty evidence" because, although he had an account, "[h]e never really used it." Ultimately, defendant argued that "this idea of promoting is not substantiated" and that "you cannot compel somebody to do that which they do," with regard to Moss and Honeycutt. Defendant moved for a judgment of acquittal, which the court denied, concluding that "there

[was] abundant evidence in the record for all counts to go forward to verdict." The trial court convicted defendant on all counts.

On appeal, defendant's sole assignment of error is to the trial court's denial of his motion to suppress the evidence obtained from the Chevrolet. Defendant argues that no exception to the warrant requirement applies and that the trial court erred in concluding that the evidence in the Chevrolet would have been inevitably discovered. The state no longer argues that evidence would have been inevitably discovered. Nor does the state pursue the "exigent circumstances" argument that it made below. Rather, on appeal, state argues that the seizure of the Chevrolet was permitted under the "plain view" exception to the warrant requirement. The state also contends that, even if the trial court erred in admitting the evidence, that error was harmless.

We need not address the parties' contentions concerning whether the trial court erred in denying defendant's motion to suppress because even assuming (without deciding) that an unlawful seizure occurred and that the trial court consequently erred in denying defendant's motion to suppress, any such error was harmless.

Under Article VII (Amended), section 3, of the Oregon Constitution, an appellate court must affirm a conviction, notwithstanding any evidentiary error, if there is little likelihood that the error affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003); ORS 19.415(2) ("No judgment shall be reversed or modified except for error substantially affecting the rights of a party."). *Davis* explains that the analytical focus is "on the possible influence of the error on the verdict rendered, not whether [the reviewing court], sitting as a factfinder, would regard the evidence of guilt as substantial and compelling." 336 Or at 32. That said, we have considered the significance of challenged evidence in light of the presence or absence of other "overwhelming evidence" of a defendant's guilt. *See, e.g., State v. Villanueva-Villanueva*, 262 Or App 530, 535, 325 P3d 783 (2014) (concluding that erroneously admitted hearsay evidence was not harmless because "there was no overwhelming evidence of guilt for defendant's convictions"); *State v. Harding*, 221

Or App 294, 302, 189 P3d 1259 (2008) (concluding that, "in light of the overwhelming evidence of defendant's involvement in the crimes of which he was convicted," there was "little likelihood" that a defendant's inculpatory statements affected the verdict).

The erroneous admission of evidence that is "merely cumulative" of, and not "qualitatively different" than, other admitted evidence is generally harmless. *State v. Blaylock*, 267 Or App 455, 472, 341 P3d 758 (2014). In determining the influence of the error on the verdict, we consider the importance of the erroneously admitted evidence to a party's theory of the case. *State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008).

Here, defendant argues that the admission of the evidence discovered inside the Chevrolet was harmful because it was "critical to the state's theory" that he was responsible for the online advertisements and also served to "refute the defense" that he did not compel Moss or Honeycutt to engage in prostitution. The state responds that, even without those items, the evidence of defendant's guilt was "overwhelming."

We first consider the import of Honeycutt's clothing and possessions taken from the Chevrolet. Defendant argues that the admission of that evidence was harmful because it contradicted his statements to police that he could not recall ever meeting Honeycutt. But there was considerable other evidence that refuted defendant on that point, including Honeycutt's and Moss's trial testimony and cell phone records showing dozens of calls between defendant and Honeycutt during the exact period of time Honeycutt testified that she worked as a prostitute for defendant. Thus, on the issue of whether defendant was acquainted with Honeycutt, the evidence seized from the Chevrolet was cumulative and harmless.

Turning to the gift cards, the state offered that evidence to show that defendant purchased online advertising, with gift cards, to promote his prostitution business. But other, unchallenged evidence also established that point, including Moss's and Honeycutt's testimony that defendant: (1) directed the content and placement of the advertising;

(2) purchased, and instructed Moss and Honeycutt to also purchase gift cards to pay for online ads; and (3) instructed Moss and Honeycutt to pay for online ads he approved with those gift cards. Photos discovered on defendant's phone were also shown to be the same photos used in Moss's and Honeycutt's online advertisements. Thus, the point for which the gift cards were introduced as evidence—that defendant purchased online advertisements in furtherance of a prostitution enterprise—was amply established by other evidence. The admission of the gift card evidence seized from the Chevrolet was cumulative and, therefore, harmless.

Next, we conclude that the motel receipts and room keys taken from the Chevrolet were cumulative of other evidence offered at trial, such as the hotel records in defendant's name. Those records showed that he had rented rooms with Moss. In addition, police officers' observation of numerous motel room keys in defendant's Chevrolet during one of the traffic stops, and Moss's and Honeycutt's testimony proved that defendant rented rooms for the women to use for prostitution.

As to the remaining items taken from the Chevrolet, defendant fails to make any argument as to why the admission of that evidence was not harmless, and we conclude that it was harmless. Some of those items (other cell phones, a bill of sale for the Chevrolet, a "Green Dot" prepaid card, a cell phone bill, a condom, and defendant's birth certificate) were simply included in a recitation at trial of the items that were taken from the Chevrolet, and were not themselves probative of the charges against defendant. Other items, including the various notes and "scripts" referring to escort services and prices, were cumulative of other evidence that defendant directed the content of the prostitution solicitations (including documents found on defendant's own cell phone).

For the foregoing reasons, we conclude that any error in denying defendant's motion to suppress was harmless.

Affirmed.