Argued and submitted March 1, affirmed September 28, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*
*v.*
JESSE ALEXANDER ESCOBAR,
*Defendant-Appellant.*
Clackamas County Circuit Court
19CR28794; A173828

519 P3d 137

Defendant appeals his conviction of crimes including first-degree robbery and second-degree assault. First, defendant challenges the denial of his motion to exclude eyewitness identification testimony. Second, defendant contends the jury instructions on second-degree assault misstated the law because they did not include a requirement that the state prove a mental state for the "causes serious physical injury" element. *Held*: The trial court erred in determining, under the framework set out in *State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012), that the state met its burden under OEC 602 of establishing that two victims had personal knowledge that provided a rational basis for their identification of defendant. However, the erroneous admission of that identification evidence was harmless because it was cumulative of other admitted evidence identifying defendant as the assailant and linking him to the crimes and their location. In light of *State v. Owen*, 369 Or 288, 505 P3d 953 (2022), the jury instructions on the elements of second-degree assault were erroneous. However, that error was harmless because, based on other instructions provided, the jury would not have found that defendant was unaware that his actions—which involved using a car jack to attack the victims—would cause serious physical injuries.

Affirmed.

Douglas V. Van Dyk, Judge.

Larry R. Roloff, argued the cause for appellant. On the briefs were Marc Brown, Senior Deputy Defender and Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jon Zunkel-deCoursey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

PAGÁN, J.

Affirmed.

## PAGÁN, J.

Defendant appeals his judgment of conviction of crimes including first-degree robbery, second-degree assault, felon in possession of a firearm, and unlawful entry into a motor vehicle. Defendant assigns error to the trial court's denial of his motion to exclude eyewitness identification testimony and he asks that we exercise our discretion to correct plain error regarding the jury instructions for the assault charge. For the reasons explained, we conclude that the trial court erred in both respects, but the errors were ultimately harmless and we therefore affirm.

We proceed in two parts. First, we analyze whether, under the contours of *State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012), there was sufficient basis for the trial court to determine that the victims had personal knowledge that provided a rational basis for their identification of defendant, despite the suggestive "showup" identification. Second, we analyze whether the jury instructions which did not include a requirement that the state prove a mental state for the "causes serious physical injury" element of second-degree assault misstated the law.

## I.   EYEWITNESS IDENTIFICATION

In defendant's first assignment, he argues that the state did not meet the threshold foundational requirements under OEC 602 and OEC 701, as applied in *Lawson/James*, to admit evidence of the victim's identification of defendant, and that even if such requirements were met, the court abused its discretion by not excluding the identifications as unfairly prejudicial under OEC 403. According to defendant, because the victims who identified him in the back of a police car after his arrest did not testify at the pretrial hearing, the state did not establish that the victims had the personal knowledge necessary to make an identification.

The state argues that defendant did not preserve his argument that because the victims failed to testify at the pretrial hearing the state failed to lay sufficient foundation. Instead, defendant's argument in the trial court focused on the suggestive nature of the showup identification and defendant asserted that the police should have

used a photographic identification instead. Moreover, the state contends that regardless of preservation, the trial court properly admitted the victim's identifications of defendant because there was sufficient foundation for personal knowledge under OEC 602, sufficient foundation for lay opinion under OEC 701, and no abuse of discretion in OEC 403 balancing.

We review a trial court's admission of eyewitness identification evidence for legal error and defer to the trial court's findings of fact as long as they are supported by any evidence. *State v. Harrell*, 292 Or App 348, 349, 424 P3d 817 (2018). If the challenge to the admission of evidence is based on unfair prejudice weighed against probative value under OEC 403, we review for abuse of discretion. *Lawson/James*, 352 Or at 762. In this appeal, as the decision to admit the evidence was based on a pretrial motion, we review the record, and state the facts, as of the time of that ruling, not as the record later developed at trial. *State v. Allen*, 312 Or App 584, 587, 494 P3d 939 (2021).

A.   *Facts Introduced at Pretrial Hearing*

Milwaukie Police Officer Odem was called to reports of a fight in a convenience store during an afternoon in April 2019. Officer Windholz also responded to the call. When the officers entered the store, they found "two males inside. [B] was bleeding from the head. *** [M] appeared to be helping the person that was bleeding." Odem did not communicate with the two men because they were speaking Spanish but learned that the two men had not been fighting with each other. Odem went back outside the store where he encountered Walsh, who had witnessed the fight. Walsh explained that she saw several males fighting with each other, but that she did not really know what happened. Walsh explained that she "knew that there was a guy that ran out of the store that had just assaulted one of the other gentlemen inside the store." She described the assailant who ran as a male, "possibl[y] Hispanic," and wearing a white shirt. Windholz learned from the store owner that "a white male with brown hair wearing a white shirt came into the store and hit *** the victim *** on the head with something."

Odem testified at the pretrial hearing that he "believe[d]" that Windholz had received descriptions from B and M that the person who assaulted them was a "white male with brown hair, wearing a white shirt." Odem believed that he and Windholz had arrived on scene within a few minutes of the assault occurring.

While Odem was speaking with Walsh, he received an alert that a robbery and assault had just taken place at a nearby theater. Thinking that the robbery at the theater might be connected to the assault at the convenience store, Odem responded to the new call by driving to the theater in his police car. When he arrived, a woman was outside, still on the phone with 9-1-1, and she directed Odem to a gas station where the subject of the robbery call had gone. At the gas station, Odem found several employees who pointed toward the south and one of the employees told Odem that "[h]e's wearing a blue tank top." From Odem's vantage point, he saw a man in a blue tank top, carrying an item of white clothing in his hand, walking across a bank parking lot. After briefly losing sight of the man, Odem saw the man emerge from inside the bank, wearing a blue tank top and still carrying the white clothing. Odem estimated that approximately five minutes had passed from the time he initially arrived to the time he spoke with defendant in the bank's parking lot and took him into custody.

In the meantime, B and M drove themselves to a hospital about two miles away. Within the next 30 to 40 minutes, Odem drove defendant to the hospital where B and M were being treated. Both of the victims came outside from their hospital room to view defendant, who was in the back of Odem's patrol car. B identified defendant as the person who had assaulted him and M identified defendant as the person who had menaced him and assaulted B. Both B and M said they were "a hundred percent" sure that defendant was the person who had assaulted them in the convenience store.

On cross-examination, Odem said that he was familiar with making a photo lineup, consisting of a suspect and five other people, but that he did not do that kind of identification in this case. Instead, Odem had both B and M

identify defendant at the same time, standing right next to each other, while defendant was handcuffed in the back of Odem's patrol car.

## B.  *Preservation*

After presentation of Odem's testimony, defendant argued that B and M should be precluded from identifying defendant at trial because the identification procedure in this case was "highly suggestive" and undermined the credibility of the identification. Defendant contended that the showup identification was "so suggestive to undermine credibility, both on [OEC] 602 and 701, but even * * * if not there, when we get to 403, when we look at probative value."

The trial court stated that it was "looking for other evidence of the probability that this identification is rationally based on the testimony of the witness and helpful to the trier of fact and based on the alleged victim's personal knowledge." After some explanation by the court about why it was denying defendant's motion to exclude, the state clarified that "*Lawson*/*James* is the case or the cases that now dictate this area. And the argument I would have made is very similar to the findings the Court's already made here." The state continued:

> "And so the [Oregon Supreme Court] wanted the trial court to go through the analysis of is this relevant evidence under 401. It certainly seems that [the] court would—is finding that it is.
>
> "And, therefore, admissible under 402, that the individuals had personal knowledge as required by Rule 602, and then by a preponderance, there needs to be a demonstration that that personal knowledge is that the inference of their identification was based on their perceptions.
>
> "And I believe that's what the court's finding here."

As we understand this colloquy, defendant raised the broader issue of the admissibility of eyewitness identifications when suggestive procedures are implicated, and raised the legal rules of OEC 602, 701, and 403—the exact formulation and sequence of analysis prescribed by *Lawson*/*James*. The state and the court responded with argument and findings that invoked the *Lawson*/*James* framework.

As we read *Lawson/James*, there is no requirement that the eyewitnesses themselves testify in a proceeding to establish admissibility. Rather, the state must provide "proof under OEC 602 that the proffered eyewitness has personal knowledge of the matters to which the witness will testify, and proof under OEC 701 that any identification is both rationally based on the witness's first-hand perceptions and helpful to the trier of fact." *Lawson/James*, 352 Or at 761-62. And we understand defendant's argument on appeal to be focused first on the OEC 602 prong, explaining that because the witnesses did not testify at the pretrial hearing, the state failed to clear the OEC 602 threshold. We conclude that defendant properly preserved his argument for appeal, first by raising the issue and second by identifying the source of his position. *See State v. McKinney*, 369 Or 325, 332, 505 P3d 946 (2022) (citing *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) for tripartite framework for preservation).

C.   *Lawson/James Framework*

We begin with a brief overview of *Lawson/James*, in which the Supreme Court established the analytical framework for determining the admissibility of eyewitness identification evidence. The framework involves the interplay between several provisions of the Oregon Evidence Code:

> "[W]hen a criminal defendant files a pretrial motion to exclude eyewitness identification evidence, the state as the proponent of the eyewitness identification must establish all preliminary facts necessary to establish admissibility of the eyewitness evidence. *See* OEC 104; OEC 307. When an issue raised in a pretrial challenge to eyewitness identification evidence specifically implicates OEC 602 or OEC 701, those preliminary facts must include, at minimum, proof under OEC 602 that the proffered eyewitness has personal knowledge of the matters to which the witness will testify, and proof under OEC 701 that any identification is both rationally based on the witness's first-hand perceptions and helpful to the trier of fact."

*Lawson/James*, 352 Or at 761-62. If the state satisfies its burden that the evidence is admissible, the defendant may establish that the otherwise admissible evidence should be limited or excluded under OEC 403. *Id*. at 762.

*Lawson/James* acknowledges two categories of variables that affect the reliability, and therefore the probative value, of eyewitness identification evidence: estimator variables and system variables. Estimator variables "generally refer to characteristics of the witness, the alleged perpetrator, and the environmental conditions of the event that cannot be manipulated or adjusted by state actors." *Id.* at 740. These factors include things such as level of stress in the eyewitness, the witness's attention during the opportunity to observe, environmental conditions, the physical and mental condition of the eyewitness, characteristics of the perpetrator, speed of identification, and passage of time between perception and identification. *Id.* at 744-46. To be sure, some of those estimator variables bear on a witness's opportunity to perceive events and ability to recall those events—the OEC 602 inquiry—but most of the estimator variables bear on the reliability of the identification. As noted, reliability is itself related to the probative value of evidence, which is balanced against the prejudicial effect in the OEC 403 inquiry, which is the final step of the *Lawson/James* sequence.

"System variables refer to the circumstances surrounding the identification procedure itself that are generally within the control of those administering the procedure" and include factors such as whether the identification was administered "blind", preidentification instructions, lineup construction, simultaneous versus sequential lineups, showup identifications, multiple viewings, suggestive questioning or other sources of post-perception memory contamination, and suggestive feedback. *Id.* at 740-44. System variables bear almost exclusively on the reliability analysis, and thus are properly considered in the final step of *Lawson/James*. *Accord State v. Hickman*, 355 Or 715, 730, 330 P3d 551 (2014), *adh'd to as modified on recons*, 356 Or 687, 343 P3d 634, *cert den*, 577 US 896 (2015).

The first step of the *Lawson/James* inquiry requires, as does almost every other piece of testimonial evidence about a fact, that the witness have personal knowledge of the matter. OEC 602 provides, in part:

"[A] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the

witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness."

That rule generally captures the idea that in order to testify about a fact, a witness must have both been able to perceive the fact and did actually perceive the fact. *Hickman*, 355 Or at 729 (citing Legislative Commentary to OEC 602). "[A]n identification satisfies OEC 602 if the eyewitness testifies to facts that, if believed, would permit a reasonable juror to find that the eyewitness observed the facts necessary to make the identification." *Id.* at 729-30.

Our recent case of *State v. Allen*, 312 Or App 584, 494 P3d 939 (2021), is instructive as to the quality and quantity of information sufficient to provide the required foundation under OEC 602. In *Allen*, the defendant challenged the trial court's admission of eyewitness identification, in part arguing that the state had not met its OEC 602 burden. We concluded that the evidence adduced at the pretrial hearing was sufficient to "permit a reasonable juror to find that [witnesses] made the observations necessary to identify defendant from the photos." *Id.* at 598. We specifically highlighted evidence that showed that the witnesses were arguing with and standing in close proximity to the suspect—that is, we concluded evidence that the victims standing "on the porch next to [others] and 'close' to the confrontation, and that the [female suspect] was standing 'right there' at the steps of the front porch" was sufficient to infer that the witnesses were close enough to view the suspect's facial and physical features. *Id.* Another witness testified that the challenged eyewitnesses were "very cool, very even", despite the "chaotic" scene, and we cited that demeanor as supporting the required inference of perception. *Id.* at 599. Although it was dark outside during the argument, another witness explained that the porch was illuminated by a porch light, which supported an inference that the light was on and that there was adequate illumination to perceive the suspect. *Id.* In sum, the facts of duration of the encounter (long enough to have an argument), close proximity between the witnesses and the suspect (standing next to one another), adequate illumination, and calm demeanor allowed a nonspeculative inference that the

challenged witnesses had an opportunity to and did perceive the suspect. *Id.* at 600; *see also State v. Jesse*, 360 Or 584, 597, 385 P3d 1063 (2016) (facts of conditional relevance may be "established by reasonable inferences, but not through speculation").

In contrast, in this case, Odem testified that he "found a lot of confusion" upon arriving at the convenience store. One of the victims was bleeding from the head and the other was helping the injured man, but Odem was not sure if those were the individuals who were fighting. Odem testified that he did not communicate with either B or M until he brought defendant to the hospital for the showup identification.

Recounted through Odem's testimony, Walsh said that she saw several males fighting with each other, but "didn't really know what happened." At that time, Walsh did not describe what she meant by saying one man had assaulted another. Odem talked with Walsh outside of the store, while the altercation appears to have occurred inside. There was no information to determine whether Walsh saw the males fighting with each other from inside the store, outside the store, with a clear vantage, or one that was obscured. Odem asserted that Walsh was "describing somebody having assaulted one of the individuals in the back." That assertion is ambiguous because Walsh could have been describing the location within the store or where on B's body the assault was made, and Odem's testimony never clarified that point.[1] The information Walsh provided did little to explain how B or M were situated in relation to the assailant, what they were paying attention to, how long the altercation lasted, or how B was assaulted.

The store owner provided information to Windholz that a "white male with brown hair wearing a white shirt came into the store and hit [B] on the head with something." That information, like the information Walsh provided, did little to establish that B and M had the opportunity to or did actually perceive the assailant.

---

[1] If Walsh had meant the back side of B, that would undercut an inference that B had an opportunity to observe the assailant because the assault would have happened from behind.

Finally, the information that B and M provided to Windholz about the assailant being a "white male with brown hair wearing a white shirt" was minimal, which supports some inference, but not an inference that each had an adequate opportunity to perceive the assailant. To be sure, that B and M provided a basic description is probative of the fact that they made *some* perception of the assailant, however, "nonfacial features like race, height, weight, clothing, or hair color, generally lack the level of distinction necessary to permit the witness to identify a specific person as the person whom the witness saw." *Lawson/James*, 352 Or at 755. B and M may have just as easily perceived the characteristics they provided to the police as the assailant ran away from the fight.

Although the line between permissible inference and impermissible speculation "is difficult to articulate with precision, "*Jesse*, 360 Or at 597 n 7, the logical links between the facts introduced and the required inference of personal knowledge are stretched beyond reasonable bounds in this case. From each starting point of the evidence of what B, M, Walsh, or the store owner perceived, we must assume an intermediate fact that is not supported by the evidence introduced to reach the required finding under OEC 602 and OEC 104(2). B and M minimally described the assailant, but this record does not demonstrate that either had the opportunity to observe more than the assailant's gender, hair color, race, or clothing. The store owner said that the assailant "came into the store and hit [B] on the head with something," but did not say whether B or M saw the attack coming—an intermediate fact that would help close the logical loop on the opportunity to perceive the assailant. The evidence from Walsh fails to support the same intermediate fact—that B or M were looking in a direction to perceive the assailant—because her statements do not provide any context for the fight inside the store. Although the evidence introduced in this case confirms that B and M probably had some opportunity to perceive the assailant, the evidence does not have similar qualitative parameters of physical proximity, duration of exposure, or illumination, as in *Allen*, which supported an inference that the eyewitnesses had adequate opportunity to perceive the defendant

in that case. 312 Or App at 598-99 (evidence of close-range observations sufficient to support inferences required under OEC 602); *see also Hickman*, 355 Or at 731-32 (challenged eyewitnesses provided information about ability to view and where attention was directed). That difference is sufficient to transform the required inferences we discussed in *Allen*, supported by logical probability, into inferences supported merely by logical possibility, or put differently, speculation. *Accord Jesse*, 360 Or at 597; *see also State v. Bivins*, 191 Or App 460, 467-68, 83 P3d 379 (2004) (evidence insufficient when it requires stacking of inferences).

Our conclusion is narrow. We do not decide whether, given an adequate foundation, B or M's identification could have been admitted, merely that provided the limited evidence in the record, the state did not meet its burden under OEC 602, and thus the first step in *Lawson/James*. The state thus failed to establish the admissibility of the proffered eyewitness testimony.

D.   *Harmless Error*

The state argues that even if the identification evidence from B and M was erroneously admitted, the error was harmless. Evidentiary error is not presumed to be prejudicial, and thus a defendant must demonstrate that the error affected a substantial right. *State v. Carter*, 315 Or App 246, 250, 498 P3d 822 (2021). In assessing whether a defendant has met that burden, "we consider whether the evidence was cumulative of other evidence admitted without objection, which includes assessing any differences in the quality of the erroneously admitted or excluded evidence as compared to the other evidence on the same issue." *State v. Simon*, 294 Or App 840, 849, 433 P3d 385 (2018), *rev den*, 365 Or 502 (2019). If there is "little likelihood that the particular error affected the verdict" we will affirm despite the error. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). In contrast to our limited review of the evidence provided during the pretrial hearings, when considering prejudice we review all pertinent portions of the record, but we do not "usurp the role of the factfinder and determine if [the] defendant is guilty or reweigh the evidence." *Carter*, 315 Or App at 250 (internal quotation marks omitted).

At trial, the state called multiple witnesses and introduced photographic, video, and physical evidence that tied defendant to the store where the assault took place and to M's van, parked outside the store. Setting aside B and M's identification of defendant, we summarize the additional facts adduced at trial.

B and M worked together at a food packing facility in Milwaukie. After starting work early in the morning of April 30, B and M left work around 3:00 p.m. and went to the Town Grocery & Deli in Milwaukie to get something to eat and drink. M drove his van with B as a passenger and left the van unlocked when they parked outside the store. B was in the store determining what he wanted to order when he was struck on the head. M was in the corner of the store getting a bottle of water when B was hit on the head; he did not see the assault, but he heard the store owner screaming. When M turned around, he saw a man with a car jack threatening him and demanding the keys to the van.

Walsh had stopped at the Town Grocery to get a drink and snacks on her way to a 4:00 p.m. class at Clackamas Community College. Walsh was already inside selecting her items near the back of the store when B and M entered. As Walsh was getting ready to head to the front of the store, somebody came in after B and M and screamed "Give me the fucking keys." Walsh said that she saw B get struck with something and she called 9-1-1. Walsh identified defendant as the person who was "throwing punches" and had "attacked" B. Although she said that B, M, and defendant were fighting, Walsh did not consider it "mutual combat"; B and M were trying to defend themselves and "[i]t was very much [B that] was attacked." Walsh saw B get struck with a "car jack, you know the part that actually lifts the car when you have to change the tire." Walsh also testified that she saw the assailant take off a belt and hit B with it, "[l]ike it was a whip."

B noted that after the altercation, he ended up with a belt that did not belong to him, and he was not sure where it came from. The belt was described as a black leather belt commonly worn with pants with belt loops.

M identified the jack that was used to strike B as the one that he kept in his van, which was parked, unlocked, outside the store. Although M did not check his van at the time, he immediately recognized the jack as belonging to him. M said that a day or two after the attack, he found a left-foot boot in his van that did not belong to him. After finding the boot, M and B took it to the police.

Oregon City Police Officer Horton testified about a security camera video of defendant loading things into a backpack or bag from a white Nissan that was parked at a gas station in Milwaukie. Horton said that he had been involved in a short pursuit with defendant in the white Nissan a few hours earlier after trying to stop defendant for speeding. It appeared to Horton that the occupant of the vehicle had gathered his belongings from the car before walking away from it. The white Nissan was towed from the gas station parking lot within two blocks of the Town Grocery & Deli about 45 minutes after the occupant left it.

Windholz explained that later in the evening of the same day, he was called to a parking lot behind the Town Grocery & Deli to collect a black duffel bag as "found property." When Windholz looked inside the bag the next day, he found some loose clothing, a right-foot boot, some notebooks, and a photo ID, birth certificate, and other identifying documents for defendant. According to Windholz, with the exception of different laces, the right-foot boot he found in the duffel bag and the left-foot boot M found in his van were identical.

During closing statements, the state argued that defendant had eluded police in Oregon City earlier in the day and had parked his car at the gas station about two blocks away from the Town Grocery & Deli in Milwaukie. Defendant took about 20 minutes clearing his belongings out of the car and putting them in the bag that was later found by Windholz. Somewhat later, defendant saw B and M park the van in front of the store; defendant then broke into the van, dropped the left-foot boot, and picked up the car jack. Knowing that B and M had just parked the van, he followed them into the store to get the keys. Once inside

the store, defendant attacked B with the car jack, striking him in the back of the head. M came over to intervene and stop defendant from continuing to assault B. After a struggle with M, defendant eventually ran outside and went to a nearby theater, where employees called 9-1-1 to report a robbery. Odem was able to track down and eventually arrest defendant. And despite spending several hours with Odem, defendant never claimed that he had just been assaulted and robbed.

During his closing statement, defendant argued that this was a case of confirmation bias—where Odem had already concluded that the same person was involved with the robbery call at the theater and the assault at the store. The employee at the theater misunderstood defendant's actions; defendant was not there to rob the theater, rather, he had just been robbed—a fact defendant claims was supported by his actions on video from the theater and that explained his behavior at the theater. According to defendant, when Windholz found defendant's duffel bag near the Town Grocery, that was another instance of confirmation bias because he ignored the possibility that whoever had robbed defendant had placed it there. Walsh's identification where she described the assailant as looking like M was suspect because M is shorter and thinner than defendant, never wore a goatee like defendant, never had longer hair like defendant, and has a darker complexion than defendant. Moreover, defendant argued that common sense dictated that the black leather belt could not have been his because he was arrested wearing athletic shorts with no belt loops. Defendant offered no explanation for the boot found in M's van.

As defendant framed his theory of the case, someone else assaulted B and M in the Town Grocery & Deli. We understand the harmless error analysis therefore to turn on questions of identity. To be sure, the identifications M and B made both at the hospital showup and later at trial were important to establishing defendant as the assailant inside the store. But those identifications were far from the only evidence that either directly placed defendant in the store attacking B and M or that circumstantially put defendant

in M's van and the immediate area at the time of the attack. To that extent, the erroneous admission of B and M's identification was cumulative of other evidence admitted without objection. *See State v. Stewart*, 270 Or App 333, 341, 347 P3d 1060, *rev den*, 357 Or 743 (2015) (erroneously admitted evidence that is cumulative is generally harmless). Nor can we say that B and M's identifications were qualitatively different than Walsh's—indeed, for many of the reasons discussed in *Lawson/James*, Walsh's identification may well have been more reliable than either identification from B or M.[2]

And then there is the boot. One half of a pair of boots was located in a duffel bag containing multiple forms of defendant's identification. The other half of the pair of boots was found inside the van where the car jack used in the attack was taken. The right and left boot, taken as a pair, tied defendant's identification documents to the assault weapon.

That B and M's identifications were only a portion of the state's theory of the case helps us conclude that the erroneous admission of the identifications was harmless. *State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009) (collecting instances where erroneously admitted evidence was central to theory of case and therefore more likely to affect outcome). In *Maiden*, we concluded that the erroneous admission of a crime laboratory report indicating that a substance was methamphetamine was not central to the state's case because the defendant had described himself as a "meth junkie" and had admitted using the drug earlier in the day, in addition to a presumptive positive field test result and paraphernalia consistent with methamphetamine use. *Id.* at 12, 14. Additionally, we concluded that the dispute at trial was over whether the defendant had possessed the substance, not whether the substance was in fact methamphetamine, and therefore, the identity of the controlled substance was not a central factual issue of the case. *Id.* at 16.

---

[2] For example, because Walsh was not injured in the attack, as was B, nor did her testimony indicate any sort of weapon focus, as did M's, several of the *Lawson/James* estimator variables suggest her identification was more reliable. There was also no suggestion of system variables that would have reduced the reliability of Walsh's identification.

In contrast, in *State v. Perkins*, 221 Or App 136, 145, 188 P3d 482 (2008), we concluded that erroneously admitted evidence that a coffee cup contained alcohol was central to the state's theory of the case because that coffee cup was highlighted in the state's opening argument, and in direct examination of the arresting officer, and the prosecutor "explicitly invited the jury to rely on that evidence" as indication of driving under the influence. Moreover, the "potential visceral impact" of the open container within the driver's reach—a "quintessential 'smoking gun' in a DUII prosecution"—was so great that the state introduced the coffee cup as its first exhibit. *Id.*

Unlike in *Perkins*, we conclude here that the erroneous admission of B and M's identification of defendant had little likelihood of affecting the verdict. As the state in this case argued, those identifications were only part of the theory of criminal liability. Aside from those identifications, there was also Walsh's identification, M's identification of the jack from his van, a pair of boots directly linking defendant's personal documents to the van where the jack was purloined, and defendant's quick arrest in close proximity to the store where the assault occurred. In the overall context of the case, including the other direct and circumstantial evidence, there is little likelihood that the admission of B's and M's identification affected the jury's verdict. The error in admitting those identifications was harmless.

## II.   JURY INSTRUCTIONS

In his second assignment of error, defendant argues that the jury was improperly instructed on the elements of second-degree assault, specifically whether the "'knowing' mental state for assault in the second degree applies to [the] 'causes serious physical injury'" element of that crime. Defendant acknowledges that his argument was not preserved and requests plain error review. For its part, the state now concedes that the instructions were error, but argues that the error was harmless. For the following reasons, we agree that the instructions were erroneous but conclude that the error was harmless.

After this case was argued and submitted on appeal, the Oregon Supreme Court issued *State v. Owen*, 369 Or 288, 505 P3d 953 (2022), which overruled in part *State v. Barnes*, 329 Or 327, 986 P2d 1160 (1999). *Owen* overruled *Barnes* to the extent *Barnes* held that "no culpable mental state attaches to the result element of second-degree assault," and required the state prove at least the "criminally negligent" mental state with respect to the injury. *Owen*, 369 Or at 318, 322. In light of the jury instructions given in this case, which omitted any specific mental state for the injury result element of second-degree assault, we accept the state's concession as well taken.

In affirming the conviction in *Owen* despite the erroneous instruction, the Oregon Supreme Court reasoned:

"The jury found that defendant was aware that his conduct was 'assaultive.' Because defendant was charged with using weapons in his assault of D, the jury was instructed that the state was required to prove that defendant 'knew' that his boots and the pavement 'would be readily capable of causing serious physical injury in the manner in which it was used.' The trial court also instructed that 'knew' in that context meant that 'defendant acted with an awareness.' The jury therefore found that defendant was aware while using his boots and the pavement against D that they were readily capable of causing her serious physical injury, and the jury heard evidence of D's significant injuries. * * * [I]n view of the jury's findings that defendant engaged in assaultive conduct toward D and knowingly used his boots and the ground as dangerous weapons, the jury would not have found that defendant was unaware that his actions would cause D physical injuries. Thus, the jury would have found that, at least, he was criminally negligent in failing to appreciate the risk of injury to D."

*Id.* at 324.

The same is true here. As in *Owen*, the jury in this case was instructed that it must find that defendant "act[ed] with an awareness that his conduct [was] assaultive." Likewise, the jury was instructed that the state must prove that defendant assaulted B "[b]y means of a dangerous weapon" and that "[t]he term dangerous weapon means an instrument, article, or substance which, under the

circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury." The state argued to the jury that the defendant must have known that using a car jack to assault someone would have likely resulted in not only serious physical injury, but death. The jury therefore must have concluded that defendant knowingly employed a weapon in an act that he was aware was assaultive against B. As in *Owen*, the jury would not have found that defendant was "unaware that his actions would cause [B] physical injuries." *Id*. With defendant's awareness of the nature of the car jack as a dangerous weapon, and that jack being knowingly used to assault B, the jury found that defendant was, at minimum, "criminally negligent in failing to appreciate the risk of injury to [B]." *Id*. Stated differently, even if the jury had been properly instructed as to the criminal negligence mental state for the injury element, the outcome would not be different. There is perhaps a scenario where a jury could reasonably find that a defendant used a weapon while not being at least criminally negligent to the fact that doing so could cause physical injury, but that scenario is not presented here where defendant opted to use an ostensibly lethal weapon like a car jack. The instructional error is therefore harmless.

Affirmed.