426 August 6, 2025 No. 710

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RICHARD MARK WEBB,
*Defendant-Appellant.*

Josephine County Circuit Court
19CR77452; A177834

Pat Wolke, Judge.

Submitted September 25, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Emily P. Seltzer, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Shannon T. Reel, Assistant Attorney General, filed the brief for respondent.

Appellant filed the supplemental briefs *pro se*.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

PAGÁN, J.

Affirmed.

**PAGÁN, J.**

Defendant appeals from a conviction for second-degree murder stemming from a spree of arson attacks he and a group of co-conspirators were alleged to have committed. On appeal, defendant assigns error to eleven rulings, seven with the assistance of counsel, and four *pro se*. In his first assignment of error, defendant asserts that the trial court erred by admitting expert testimony as to the cause of the deadly fire. In his second assignment of error, defendant asserts that the trial court erred by admitting the hearsay statements of alleged co-conspirators. In his third and fourth assignments of error, defendant asserts that the trial court erred by admitting various statements made by a jailed co-conspirator on the basis that they were against penal interest. In his fifth and sixth assignments of error, defendant asserts that the trial court erred by admitting evidence of misconduct from before and after the deadly fire. In his seventh and final counseled assignment of error, defendant asserts that the trial court erred by admitting evidence that defendant had abused a key witness in the case.

Defendant's first through third *pro se* supplemental assignments of error are unpreserved and defendant does not ask for plain error review, so we do not reach them. In his fourth *pro se* supplemental assignment of error, defendant asserts that the trial court erred by denying defendant's motion for judgment of acquittal (MJOA). As we explain below, we affirm on all assignments of error.

## I.   BACKGROUND

In Cave Junction, on the night of January 15, 2019, a fire started in the house of T, killing him. Fire Marshal Ismaili and Oregon State Police Detective Feland led the resulting investigation, and they determined that the cause of the fire was incendiary, *i.e.*, human-caused. In support of that theory, among other evidence, was surveillance video of a group of people exiting a vehicle near T's house, lighting what appeared to be a flare, and then running away. Ismaili and Feland searched T's yard and found a flare cap. They suspected that someone had thrown a lit flare through T's window, thus starting the fire. The investigation turned up

no suspects for ten months—until defendant's ex-girlfriend, C, contacted the police.

Based on C's statement, police determined that a group of four men might have been behind the incident: Crow, Mason, Kenny Webb (Kenny), and Kenny's brother—defendant Richard Webb. Police eventually interviewed defendant, who admitted his partial involvement in a spree of crimes allegedly committed by the four men that evening—but denied that he was responsible for the fire that led to T's death. Defendant claimed that one of the other men was responsible, and that the weapon had been a Molotov cocktail, not a flare.

Testimony from police, C, and various local witnesses established the outline of the night's events. Crow, Mason, Kenny, defendant, and their friend M[1] had started drinking. After becoming drunk, they started complaining about local "tweakers," "pedophiles," and "homeless people." Mason, Kenny, Crow, and M hatched a plan to go to a local homeless camp and tear it down, as a form of what Crow would later describe as "Cave Junction justice." Mason drove the men, without defendant, to the camp. Crow and Kenny then got out and tore down the camp. After driving away, Crow threw a lit flare at a bus that a local man and his son were living in.

Slightly later, the men (still without defendant) drove to a wooded area adjacent to T's house. There they saw F, a local woman who had been living in a makeshift structure in T's yard, with the permission of T. Upon seeing her, either Kenny or Crow then threw a flare at F and yelled "you're gonna die, bitch" at her. The attack was captured on video, but the flare caused no damage. The men then returned to the home where they had been drinking. Upon their return, Mason, Webb, Crow, and defendant went into a backroom of the house where they had a private conversation that C was excluded from.

The men continued drinking. Sometime after 11 p.m., Mason drove the group, including C and defendant, but not M, to a convenience store to get more beer. Surveillance video indicated that they left the convenience

---

[1] M, like C, was present at various points during the night's misconduct, but had only a minor role and was not charged.

store at 11:38 p.m. C testified that they then drove back to near T's house, where Crow, Kenny, and defendant left the vehicle. Mason and C then drove off.

The next chain of events was established by the same video camera that recorded the earlier flare attack against F. The camera captured a vehicle stopping near T's house at 11:48 p.m. Several figures left the vehicle, which then drove away. At 11:50 p.m., a very bright light illuminated the area,[2] which Feland and Ismaili later concluded was a flare. A single figure then ran down the hill towards the camera, but the camera did not capture the person's face.

At 12:02 a.m., a neighbor called 9-1-1 to report a fire in T's house; the neighbor later testified that the fire had a pink color to it. When firefighters arrived at 12:09 a.m., the front window of T's house was broken,[3] and a fire was burning in the front room, with smoke pouring from the roof. T was unable to escape the house, and firefighters found his body near the front door. An autopsy determined that T died of smoke inhalation.

Around the time that the neighbor called 9-1-1, Mason and C picked up Crow, Kenny, and defendant from a nearby high school that they had agreed upon as a rendezvous point. C testified that defendant, Kenny, and Crow noted that the house was on fire, and that they believed that there were people inside. Mason testified that Crow said he threw a rock through the window, and that defendant said he threw a flare through the window. Mason noted that Crow, Kenny, and defendant were "kind of nervous, scared." They circled the block in their car a few times—long enough for Mason to notice flames in the window of T's house and for firefighters to arrive—but none of them called 9-1-1.

The group then drove to a home that Kenny wanted to move into, broke in, and argued with the residents, whom the group alleged were "cooking dope." As they left, Crow stayed behind, and C noticed what appeared to be a Molotov

---

[2] The video is black and white, and therefore the light is white on video, but other testimony indicated that the flares were classically red in color.

[3] Firefighters proceeded to smash the window fully to fight the fire, but testimony and video footage indicated that it was partially broken upon the firefighters' arrival.

cocktail on the front porch which had not been there when they arrived. One of the cars in the driveway subsequently burned. Crow later said he had thrown a rock through the window of the car. The group then returned home and came up with a cover story for if they were investigated.

The state charged Crow, Mason, Kenny, and defendant with the murder of T. Each man, other than defendant, took a plea deal.[4] The state went to trial against defendant on four counts: first-degree arson, ORS 164.325 (Count 2); second-degree murder, ORS 163.115 (Counts 3 and 7);[5] and first-degree burglary, ORS 164.225 (Count 5). The state's theory was that defendant had thrown a lit flare through the window of T's house, which started the fire that ultimately killed T. A jury found defendant guilty on all counts, which the court merged into one conviction on Count 3, second-degree murder. The court sentenced defendant to life in prison with the possibility of parole after 25 years. Defendant timely appealed and filed a counseled brief as well as supplemental *pro se* briefing.

## II.  ANALYSIS

### A.  *Expert Testimony as to the Cause of the Deadly Fire*

In his first assignment of error, defendant asserts that the trial court erred by admitting expert testimony by Feland and Ismaili as to the cause of the deadly fire. Defendant argues that this evidence was inadmissible under OEC 401, 403, and 702, as well as for constitutional reasons. Defendant moved to exclude the testimony of the state's fire experts *in limine* before trial. That motion raised defendant's core argument—that the methods used by the experts did not comply with a standard accepted in federal courts—but did not raise an OEC 403 argument or the

---

[4] Crow (19CR77443), Mason (19CR77440), and Kenny (19CR77468) each pleaded guilty to second-degree manslaughter and first-degree burglary. Crow and Kenny were sentenced to 125 months of incarceration. Mason was sentenced to 100 months' incarceration, which included consideration for his testimony in defendant's case.

[5] Count 3 alleged that defendant and/or Kenny caused the death of T in the course of committing first-degree arson, thus elevating the death to second-degree murder. Count 7 alleged in the alternative that defendant and/or Kenny caused the death of T while committing first-degree burglary, thus elevating the death to second-degree murder.

federal constitutional argument that defendant raises on appeal. We agree with the state that defendant's constitutional argument and OEC 403 argument are unpreserved, and, as defendant has not requested plain error review, we will not reach them.

Defendant's remaining argument is that Feland and Ismaili's methodology was not based on reliable scientific methodology, because they failed to conform their investigation to the National Fire Protection Association (NFPA) standard 921, which is the industry methodology for fire investigation. As we explain, even if the preserved portion of defendant's argument does identify error, it was harmless.

A trial court's error in admitting evidence is harmless if there is "little likelihood that the error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). To determine "whether erroneously admitted or excluded evidence affected the verdict, we consider the nature of the evidence in the context of the trial as a whole." *State v. Simon*, 294 Or App 840, 849, 433 P3d 385 (2018), *rev den*, 365 Or 502 (2019) (citing *Davis*, 336 Or at 33-34). In doing so, we "review all portions of the record, not just the evidence most favorable to the state." *Id.* If we conclude that a trial court's error was harmless, we must affirm the conviction. *Davis*, 336 Or at 32.

Feland and Ismaili's expert opinions concerned whether the fire was human-caused. Defendant argues that Feland and Ismaili did not appropriately consider, as required by NFPA 921, whether the fire could have had an accidental cause, such as starting in an appliance or the attic.[6] But the argument that testimony regarding a potential accidental cause for the fire could have made any difference in the outcome of the trial overstates defendant's impeachment of the experts and understates the evidence of intentional arson. The circumstances strongly indicated

---

[6] This is not defendant's only issue with Feland and Ismaili's technique. Defendant called his own fire expert at trial, who raised issues with evidence that Feland and Ismaili did not collect and their overreliance on the imprecise art of visual fire spread, among other issues. On appeal, defendant contends that Feland and Ismaili's technique was deficient in the ways identified by his expert. But, as we explain in the text, whatever their technique, it still boiled down to one fundamental question: What was the cause of the fire, and the only options were that it was incendiary, accidental, or undetermined.

that the fire was human-caused and that one or more of the co-conspirators had intentionally started the fire. Shortly before the fire was reported, a surveillance camera captured three figures leaving a car and thereafter lighting what appeared to be a flare at T's house. The neighbor who reported the fire testified that the fire had a pink color. Feland and Ismaili found a flare cap in the yard of T's house. Video and testimony indicated that the front window of T's house was broken when firefighters arrived, indicating an object may have been thrown through it. Further, based on the other events of the night, the evidence indicated that the men had flares with them and knew how to use them. C and Mason testified as to how the men had been at the house shortly before the fire, to the incriminating statements of defendant and Crow, and to how none of the men called 9-1-1 despite seeing the fire. Defendant's statement alone, that he himself believed the fire was intentionally set, but not by him, undermines the argument he makes now on appeal.[7]

Even if we agreed that Feland and Ismaili's testimony was improper, given the considerable evidence that the fire was not an accident, including defendant's own admission to that fact, along with the evidence of the conspiracy both before and after the fire, Feland and Ismaili's opinion that the fire was intentionally started had little likelihood of affecting the verdict.

B.  *Statements Made by Co-conspirators Generally*

In his second assignment of error, defendant asserts that the trial court erred by admitting the hearsay statements of alleged co-conspirators in furtherance of the conspiracy. Pretrial, the court denied defendant's motion to exclude the statements of co-conspirators in furtherance of the conspiracy that defendant anticipated would arise in various portions of witness testimony. After a hearing on the issue, the court found that defendant, Crow, Mason, and Kenny had been co-conspirators beginning the night of the attacks, and lasting through until their jailing, because they had sought to cover up their involvement. The court made detailed findings as to when each co-conspirator had become

_____

[7] Defendant claimed that Crow was responsible for setting the fire, and that he used a Molotov cocktail.

involved in the conspiracy during the night's events, and with respect to which other co-conspirators. Having made those findings, the court ruled that the challenged statements were admissible under an exception to the hearsay rule. On appeal, defendant takes issue both with that pretrial ruling, arguing that there was not sufficient proof of a conspiracy, and with the application of it during the trial.

During trial, the state elicited testimony from various witnesses that included hearsay from co-conspirators, made both before and after defendant joined the conspiracy. Statements made during defendant's participation in the conspiracy were wide ranging, and included statements made in the car as the men drove around, crucial quotes in the minutes after the fire started, and statements related to the coverup. Statements made prior to defendant's joining of the conspiracy included that the purpose of the conspiracy was to attack "tweakers," "pedophiles," and "transients"; and to enact "Cave Junction justice," as well as the "you're gonna die, bitch" statement made to F. Defendant did not object to the co-conspirator statements at trial.

We first address whether the trial court erred in finding that there was a conspiracy, and then turn to the elicited testimony. Defendant argues that the evidence was insufficient for the court to find that he entered a specific conspiracy to set fire to the victim's house. We disagree. Further, we conclude that any error in the admission of statements made prior to defendant joining the conspiracy was unpreserved and is not plain error.

We apply a two-part standard of review to a trial court's evidentiary ruling that a statement fits within an exception to the hearsay rule. *State v. Cunningham*, 337 Or 528, 538-39, 99 P3d 271 (2004), *cert den*, 544 US 931 (2005). We will uphold the trial court's preliminary factual determinations if any evidence in the record supports them. *Id.* at 537-38. However, we review the trial court's ultimate legal conclusion, as to whether the hearsay statement is admissible under an exception to the hearsay rule, for legal error. *Id.* at 538; *see also State v. Cook*, 340 Or 530, 537, 135 P3d 260 (2006) (restating that standard); OEC 801 - 806 (defining hearsay and explaining the exceptions).

An out-of-court statement by a co-conspirator is not hearsay if the party seeking admission proves "(1) that there was a conspiracy in which both the accused and the declarant were members; (2) that the declarant made his or her statement 'during the course' of the conspiracy; and (3) that the statement was made 'in furtherance of the conspiracy.'" *State v. Cornell*, 314 Or 673, 677, 842 P2d 394 (1992).

> "ORS 161.450(1) states that a criminal conspiracy exists if, 'with the intent that conduct constituting a crime punishable as a felony or a Class A misdemeanor be performed, [a] person agrees with one or more [other] persons to engage in or cause the performance of such conduct.' Although the substantive law defines a criminal conspiracy, the Oregon Evidence Code states the evidentiary principles concerning the admissibility of coconspirator statements. A person need not be charged with or found guilty of criminal conspiracy or of the underlying crime in order to be a coconspirator under OEC 801(4)(b)(E). Because there usually is no formal agreement to begin a conspiracy, the very existence of a conspiracy usually must be inferred from the facts surrounding the statements."

*Id.* at 678.

Based on the trial court's view of the facts in the record, and accepting reasonable inferences and reasonable credibility choices, we conclude that there was sufficient evidence to support the trial court's finding, by a preponderance of the evidence, that a conspiracy existed between defendant, Kenny, Mason, and Crow starting at the time that Kenny, Mason, and Crow returned from the first series of attacks and thereafter had a private conversation with defendant.

At trial, defendant did not object to a range of hearsay statements made prior to when the court found defendant had joined the conspiracy and, on appeal, he asks us to undertake plain error review. A plain error is (1) an error of law that is (2) obvious and not reasonably in dispute, and (3) apparent on the record. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). Here, any error is not obvious or reasonably beyond dispute because this case raises a novel legal question of whether a co-conspirator's statement of purpose (to attack "tweakers," "pedophiles," and "homeless people"; and to enact "Cave Junction justice"), and other associated

statements, made prior to defendant's joining of the conspiracy, may be admissible to show that the purpose of the conspiracy was the same when defendant joined the conspiracy. Any error was not plain.

C.   Statements Made by Co-conspirator Crow While Jailed

In his third and fourth assignment of error, defendant asserts that the trial court erred by admitting various statements made by Crow. The court admitted the statements on the state's motion on the basis that they were against Crow's penal interest. Defendant argues that the statements were exculpatory of Crow because they attempted to pin the blame on defendant, and thus could not be properly considered as against Crow's interest. While the case implicates an unresolved question in the law, we conclude that any error was harmless.

While jailed, Crow made a phone call during which he became very upset, which prompted the intervention of a deputy; Crow explained that he had just been broken up with. The deputy subsequently listened to the phone call and learned that Crow had expressed suicidal ideation. The deputy then took Crow aside for a long form interview to determine if Crow was a risk to himself or others. During that conversation, Crow made the following statements, which were later admitted as evidence at trial via the deputy: He was going to "rat on his co-defendants and finally tell the truth about his involvement,"[8] and "I don't care if people call me a rat. I just found out Mason got his jaw broken in prison for ratting. I don't care anymore. *** I am not going to let my co-defendants roll over on me." The court also admitted as evidence the audio excerpt of the jail call in which Crow stated, "I'm done *** trying to cover for everybody else's bullshit, you know?" and that he would "do whatever it takes" to get back to his wife. Defendant moved to exclude the statements pre-trial; the court denied the motion.

OEC 804(3)(c) provides that a hearsay statement is admissible if the declarant is unavailable as a witness if the statement

---

[8] This is the officer's paraphrased description.

"at the time of its making *** tended to subject the declarant to civil or criminal liability ***, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

OEC 804(3)(c). A statement against penal interest that incriminates the defendant does not require the same corroboration as one which exculpates the defendant. *State v. Tucker*, 109 Or App 519, 525, 820 P2d 834 (1991), *rev den* 317 Or 188 (1993). Our caselaw, however, is divided as to how statements which are both inculpatory and exculpatory are dealt with.

Defendant relies on two cases from 1999 which both had combination inculpatory/exculpatory statements in support of his argument that the trial court erred in admitting Crow's statements: *State v. Ventris*, 164 Or App 220, 229, 991 P2d 54 (1999), and *Wood v. Baldwin*, 158 Or App 98, 101, 972 P2d 1221, *rev den* 329 Or 61 (1999). In *Ventris*, the defendant sought to admit testimony that, shortly after the charged events, he had told a friend that he had participated in a robbery, but that the charged murder had occurred after he left. In *Wood*, a third party stated that he, but not the defendant, had participated in the charged crime. In both cases, we deemed the inculpatory first part of the statement to be admissible, but the exculpatory second part inadmissible.

Conversely, the state urges us to follow *Cook*, 340 Or 530, in which the statement at issue was not parsed into inculpatory/exculpatory aspects and was admitted in full context. Though the discrepancy between these approaches is an unresolved question, we do not reach it, because the admission of Crow's statements was ultimately harmless.

At a base level, Crow's statements were self-serving. He was attempting to shift blame to his co-conspirators and avoid a murder charge. But his statements did not go to the crux of the case: Who threw what through T's window? Crow's statements indicated that he and his co-conspirators were present throughout the night's misconduct, but that

fact was made clear through the direct testimony of Mason and C, video surveillance, and defendant's statements. Crow's statements were cumulative and had little likelihood of affecting the verdict. *See State v. Stewart*, 270 Or App 333, 341, 347 P3d 1060, *rev den* 357 Or 743 (2015) (evidence seized from a vehicle that linked the defendant to one of his prostitutes was cumulative to copious other evidence that the defendant was her pimp, and therefore the admission of the unlawfully seized evidence was harmless).

D.  *Evidence of Misconduct Before and After the Deadly Fire*

        The state put on evidence of the broader spree of uncharged crimes that defendant and his co-conspirators were alleged to have committed on the night of T's death. Defendant challenges the admission of that evidence in his fifth and sixth assignments of error. In his fifth assignment of error, defendant asserts that the trial court erred by admitting evidence of the attacks on the homeless camp, the bus, and F (the woman near T's house), carried out by Kenny and/or Crow before defendant had joined the conspiracy. In his sixth assignment of error, defendant asserts that the trial court erred by admitting the evidence that, after the arson at T's house, the conspirators (including defendant) broke into a nearby home, and that one of the conspirators (most likely Crow) then set fire to a car.

        Defendant argues that this other bad acts evidence was unfairly prejudicial propensity evidence and had no other relevance.[9] The state argues that the evidence of the other attacks undertaken by the conspirators illustrates what "Cave Junction justice" looked like, that defendant was part of the common plan to enact such misconduct, and that the use of incendiary devices in each attack linked them together. The state argues that the evidence was relevant to show both motive and intent. The trial court admitted the evidence upon a motion by the state, on the grounds that the conduct was admissible to prove both motive and intent.

        "We review the trial court's determination that other acts evidence is relevant and admissible under OEC

---

[9] Defendant also raises a due process claim, but that claim is unpreserved and defendant does not request plain error review.

404(4) for legal error. We review whether otherwise admissible evidence should be excluded as unfairly prejudicial under OEC 403 for abuse of discretion." *State v. Hernandez*, 339 Or App 127, 129, 566 P3d 677 (2025) (internal quotation marks and citation omitted).

The Supreme Court clarified in *State v. Davis*, 372 Or 618, 633, 553 P3d 1017 (2024) that OEC 404(4)—not OEC 404(3)—alone controls the admission of other acts evidence against a criminal defendant. OEC 404(4) provides that admission of a defendant's crimes, wrongs, and other acts is limited only by certain enumerated provisions of the Oregon Evidence Code, the state and federal constitutions, and the rules of privilege and hearsay. The practical implication is that OEC 404(4) sometimes, but only in rare situations and subject to OEC 403, allows for propensity-based reasoning. *Davis*, 372 Or at 635. The general rule remains that evidence that relies on propensity-based reasoning is unlikely to be relevant. *Id.*

Defendant's case is one of many on appeal that went to trial before *Davis*, when OEC 404(3) was being widely applied to other acts evidence in criminal cases. As we lay out in greater depth in *State v. Lopez*, 341 Or App 781, 784, ___ P3d ___ (2025), the approach for reviewing pre-*Davis* cases that relied on OEC 404(3) follows two steps. First, we determine whether the evidence was relevant for a nonpropensity purpose under OEC 401.[10] Second, we look to whether the trial court abused its discretion when undertaking OEC 403 balancing. "[C]onsidering how the proffered evidence would have fared under OEC 404(3) is a conceptually helpful tool in determining whether the evidence may be admitted under the balancing required by OEC 403." *Lopez*, 341 Or App at 784 (internal quotations omitted). "If the trial court has correctly concluded that the evidence does not require the factfinder to employ propensity reasoning, we may affirm, even

---

[10] If the evidence is partly for a propensity purpose, *Davis* illustrates that the evidence may still be generally within a court's OEC 403 discretion to admit. *See Davis*, 372 Or at 641 (addressing how to deal with notes that expressed a defendant's sexual intent, which were partly, but not substantially, character based). We are not called upon to address how evidence which is wholly for a propensity purpose should be dealt with in this procedural posture; at any rate, the facts here do not indicate that the evidence was admitted wholly or even partly for propensity purposes.

if the trial court analyzed the evidence under OEC 404(3) rather than OEC 404(4)." *Id.* (internal quotations omitted). OEC 404(3) provides that

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

"Motive is * * * a cause or reason that moves the will and induces action, an inducement which leads to or tempts the mind to commit an act." *State v. Hampton*, 317 Or 251, 257 n 12, 855 P2d 621 (1993). The state may introduce such evidence to show why the defendant "did what he did," but the state need not prove it to establish guilt. *Id.*

Before trial, the state argued, in support of the admission of the evidence of the events of the night in question:

> "The State is not offering the evidence to show [the] defendant has a propensity for violence. The State is offering such evidence to explain and establish an on-going conspiracy of threatening and intimidating individuals under the guise of "[Cave Junction] Justice" and the manner of dispensing "CJ Justice." Further, it establishes these individuals had access to flares, "bombs," recruiting of [defendant] to participate in furtherance of the conspiracy, and establish there was a common plan to engage in this behavior among the individuals involved, and also independent investigation of events corroborate statements provided by [Mason], [M] and [C], whom the state believes the defense will attack as fabrications and/or inaccurate recall."

We first address the acts that occurred prior to defendant joining the conspiracy. In the circumstances of this limited conspiracy, of which the main events occurred in a single night, we agree with the state that the evidence was relevant for a nonpropensity purpose. The evidence of the prior attacks showed that the men had access to flares and knew how to use them. The video of the earlier flare attack against F also showed the visual similarity of the later attack against T's house caught on the same camera. It also explained the men's motive, to show that the men

had been attacking those they believed to be homeless, pedophiles, or tweakers. Unlike the other people the men had attacked that night, there were no indications that T fit into those categories. But because the men had attacked the semi-homeless F earlier, the subsequent attack on the same property corroborated the inference that it was another attempt to attack F or people associated with her. That the men had attacked F earlier in the night and told her "you're gonna die, bitch" also went to show that the conspirators' intent was to cause harm.

Under our case law using OEC 404(3), such evidence was properly admitted as evidence that did not rely on propensity, and demonstrated motive, intent, and knowledge. *See State v. Taylor*, 372 Or 536, 543, 551 P3d 924 (2024) (where the defendant allegedly assaulted a woman in an unusual fashion, video of similar misconduct, which began about 30 minutes prior to charged conduct, was admissible to show defendant's "state of mind and course of conduct"). Similar to the evidence in *Taylor*, the evidence here established not only the aims and methods of the conspirators' ultimate goal, but also the specific locale where the plan would be and was first executed.

Those theories of relevance satisfy us that the evidence was relevant for nonpropensity purposes, even though the trial court analyzed it under OEC 404(3) rather than under OEC 404(4). *See Davis*, 372 Or at 633 (if evidence has a nonpropensity purpose, it is more likely to survive the OEC 403 analysis); *Lopez*, 341 Or App at 784 (validating a court's pre-*Davis* use of OEC 404(3)). As just noted, the state's theory of relevance for the admitted prior conduct was valid for several theories, including motive, intent, knowledge, and plan. None of those theories relied on propensity inferences, nor did the trial court abuse its discretion under OEC 403. The evidence was properly admitted.

We next turn to the subsequent acts. These acts included defendant's participation and showed that he continued to be involved in the conspiracy to attack those whom the men believed to be lesser, which was additional direct evidence of motive and established the timeline of the post-murder period. Defendant argues that, based on *State*

*v. Carreiro*, 185 Or App 19, 22, 57 P3d 910 (2002), subsequent misconduct is only rarely admissible under OEC 404. But in *Carreiro*, the subsequent misconduct (being found with drug scales and cash during a drug bust) had occurred 11 months after the charged conduct (being found in his girl-friend's house nearby a safe with drugs), unlike here, where the subsequent misconduct occurred within half an hour after the charged conduct, with the same conspirators, in the same car. Again, like in *Taylor*, the evidence offered here was of events that occurred so closely in time and proximity to the alleged criminal conduct that the prejudicial value—that is, the likelihood that the evidence would be used for an improper purpose—was very low. *Taylor*, 372 Or at 543. The evidence was relevant and the trial court did not abuse its discretion by admitting it.

E.  *Evidence of Defendant's Abusive Conduct Towards Witness C*

In his seventh and final counseled assignment of error, defendant asserts that the trial court erred by failing to *sua sponte* strike testimony that defendant had abused and threatened C, a key witness in the case. Specifically, defendant identifies C's comment that "[t]here was a lot of abuse from [defendant] throughout that relationship," as improper. Defendant did not object to the comment at the time of trial, and therefore requests plain error review. We conclude that even if the error was plain, we would not exercise our discretion to correct it.

T died in January, but C did not approach police about the events of that night until October, after defendant had been arrested for assaulting her. Defendant was charged in a separate proceeding (19CR68942) and pleaded guilty to attempted assault in the second degree (ORS 163.175). Before trial, the state moved to admit evidence of the assault against C, as well as other uncharged abuse against C and others. The court denied the state's motion, reasoning that the evidence was substantially more prejudicial than probative, but it noted that the state would be allowed to bring in evidence of the abuse against C if the defense made C's late disclosure an issue. At trial, C stated, unprompted, "[t]here was a lot of abuse from [defendant]

throughout that relationship." Defendant did not object and asks us to undertake plain error review.

Even if the error was plain, we would not exercise our discretion to correct it. We are not required to reverse all plain errors, and instead may exercise our discretion not to. *Vanornum*, 354 Or at 630. When deciding whether to exercise our discretion to consider a plain error, we may consider, but are not limited to, the following factors:

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Ailes v. Portland Meadows Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991); *see also State v. Horton*, 327 Or App 256, 265, 535 P3d 338 (2023*)* (discussing considerations beyond the *Ailes* factors). We must, however, be careful not to conflate harmlessness and discretion. *State v. Ortiz*, 372 Or 658, 671, 554 P3d 796 (2024) (concluding that non-harmlessness was not a legally sufficient reason to reverse on plain-error review).

Here, we would not exercise our discretion because the error was not grave, and defendant may have had strategic reasons not to object. The challenged statement came directly after C testified that defendant told her she had to keep quiet or else "my life and my family's life would be in danger." In context, the statement about abuse could be reasonably read as reflecting defendant's threats regarding silence. Combined with the fact that C did not mention an assault, or mention details of the other uncharged abuse, it would not be obvious to a juror that C was referring to physical assaults. Had defendant objected, he would have highlighted the statement to the jury, or potentially confused C and elicited much more damaging testimony unintentionally, and it may have been a reasonable trial strategy to avoid doing so, particularly if counsel knew the state could have C clarify that she was referring to abuse related to the coercion. *See State v. Wiltse*, 373 Or 1, 23, 559 P3d 380 (2024)

(a defendant's potential strategic decision not to object may weigh against exercising discretion). We therefore decline to exercise our discretion to correct any error here.

F.   *Motion for Judgment of Acquittal*

In his fourth supplemental *pro se* assignment of error, defendant asserts that the trial court erred by denying his motions for judgment of acquittal (MJOA) on Count 2 (arson) and Count 5 (burglary).

A judgment of acquittal is appropriate if the evidence is insufficient to support a verdict. *State v. Cunningham*, 320 Or 47, 61-62, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995); *State v. Newkirk*, 319 Or App 131, 133, 509 P3d 757, *rev den*, 370 Or 214 (2022). We review questions of the sufficiency of the evidence in a criminal case following a conviction by examining the evidence in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential elements of the crime beyond a reasonable doubt. *Cunningham*, 320 Or at 63. Our decision is not whether we believe that a defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for the factfinder to so find. *Id*.

Under ORS 164.325, arson in the first degree, as relevant here, is defined as when:

"(a)   By starting a fire or causing an explosion, the person intentionally damages:

"* * * * *

"(B) Any property, whether the property of the person or the property of another person, and such act recklessly places another person in danger of physical injury or protected property of another in danger of damage[.]"

Here, the state put on evidence that defendant threw a lit flare through the window of T's home, which started a fire that led to the death of T. The evidence included the video of the time before the fire, testimony by Mason and C, the flare cap found in T's yard, and the testimony of the medical examiner. A reasonable juror could have concluded that defendant intentionally started the fire, and that setting

the fire recklessly placed T in danger of physical injury. The trial court did not err by denying defendant's MJOA as to Count 2.

Burglary in the first degree, as relevant here, is defined as when a "person enters or remains unlawfully in a building with intent to commit a crime therein," and that building is a dwelling. ORS 164.225; ORS 164.215.

A person may commit burglary by using an instrument, rather than the defendant's body, but only if that use is for achieving the underlying criminal purpose, not merely for the sake of forcing entry. *State v. Mayea*, 170 Or App 144, 148, 11 P3d 264 (2000) (throwing a board through a window solely to gain entry was not burglary). The use of an instrument which has a dual purpose also constitutes burglary; that is, it is both used for entry and to achieve the underlying criminal purpose. *State v. Williams*, 127 Or App 574, 579, 873 P2d 471, *rev den* 319 Or 274 (1994) (use of bullet, which both forced entry and killed infant inside home, constituted burglary).

Here, defendant never personally entered any part of T's house. Rather, he was alleged to have used an instrument: the flare. Even if Crow had not (as he claimed) first broken the window by throwing a rock, defendant's use of a flare to both break the window and start the fire inside T's house made it a dual instrument, like the bullet in *Williams*. The state presented evidence to support that theory of events, and it was sufficient to support a conviction. There is no reasonable dispute that T's house was a dwelling, that defendant did not know T, or that defendant lacked permission to throw a lit flare through the window. Defendant's argument is an attempt to have us reweigh the evidence, rather than view the evidence in the light most favorable to the state, as we must do under our standard of review. The trial court did not err by denying defendant's MJOA as to Count 5.

G.  *Defendant's Other Supplemental Assignments of Error*

Defendant's first through third supplemental *pro se* assignments of error are unpreserved, and he does not request plain error review, and thus we reject them. *State v.*

*Ardizzone*, 270 Or App 666, 673, 349 P3d 597, *rev den* 358 Or 145 (2015) (we engage in plain error review only by request). Insofar as defendant requests plain error review in his supplemental reply briefing, he waived the argument by failing to raise it in his opening brief. *See Ploplys v. Bryson*, 188 Or App 49, 57, 69 P3d 1257 (2003) ("An issue raised for the first time in an appellant's reply brief generally will not be considered on appeal.").

### III.   CONCLUSION

For the forgoing reasons, we conclude that the trial court did not err, or that any error was unpreserved or harmless.

Affirmed.